489 S.E.2d 200

**SOUTH CAROLINA INSURANCE COMPANY, Plaintiff,**

**v.**

**FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC. and United States Fidelity & Guaranty Company, Defendants.**

**No. 24668.**

Supreme Court of South Carolina.

Heard April 2, 1996.

Decided Aug. 11, 1997.

208

Robert E. Salane and Andrew E. Haselden, both of Barnes, Alford, Stork & Johnson, L.L.P., Columbia, for Plaintiff.

Stephen P. Groves, Bradish J. Waring and Stephen L. Brown, all of Young, Clement, Rivers & Tisdale, L.L.P., Charleston, for Defendants.

TOAL, Justice:

The United States District Court for the District of South Carolina has certified the following question to this Court:

> When a blanket insurance policy and a specific policy provide coverage for the same peril to the same property and interest, does South Carolina require that the specific insurance policy coverage limits be exhausted first before application of the blanket policy or will the policies be pro rated according to the respective policy limits of each policy?

### Factual/Procedural Background

For a period of time, plaintiff South Carolina Insurance Company ("SCIC") and defendant United States Fidelity and Guaranty Company ("USF & G") both insured certain buildings at Mike Smith Chevrolet, an automobile dealership located in Myrtle Beach, South Carolina. The USF & G policy was a comprehensive business insurance policy providing blanket property insurance covering three buildings at Mike Smith Chevrolet, as well as buildings at dealerships located in Florida and other states. The SCIC policy was a specific policy

providing insurance coverage for commercial property, general liability, and crime coverage for five separate buildings located at Mike Smith Chevrolet. The USF & G policy and the SCIC policy contained identical "other insurance" clauses providing their coverage would be "excess" to any other insurance on the property.

On September 21–22, 1989, Hurricane Hugo came ashore South Carolina, south of Myrtle Beach, and, as a result of Hurricane Hugo's winds and rain, Mike Smith Chevrolet's buildings sustained various degrees of damage. At the time of the hurricane, Mike Smith Chevrolet was insured by both SCIC and USF & G. The losses were reported to both insurance companies, and SCIC adjusted and paid the claim. USF & G has not paid any sums to SCIC as contribution for the damages or adjusting expenses incurred in connection with the claim by Mike Smith Chevrolet.

On September 14, 1992, SCIC filed suit in state court in Richland County against defendant USF & G. SCIC sought contribution from USF & G for the payments it made to Mike Smith Chevrolet. USF & G removed the case to federal district court on October 15, 1992. One day later, USF & G filed its answer to SCIC's complaint and alleged as an affirmative defense the fact that SCIC's policy provided specific coverage that must be exhausted before USF & G would be liable. The parties agree no facts are in dispute.

After filing a Stipulated Statement of Facts with the federal court, both parties moved for summary judgment. The federal district court determined that the action involved questions of South Carolina law for which there was no controlling precedent in the decisions of the South Carolina Supreme Court. The federal court therefore certified to this Court the question listed above. On November 9, 1995, we agreed to answer the certified question.

## LAW/ANALYSIS

When judges first set about the task of interpreting insurance policies, we looked confidently to tried and true principles of contract law. After all, lawyers are taught in their earliest classes that the common law rules of contract are the bedrock of all Anglo–American jurisprudence, thus judges

clearly had at hand the perfect tools for crafting fair and lucid interpretations of insurance agreements. We failed utterly to anticipate the linguistic excesses to which the insurance industry would resort in order to avoid paying claims when "other insurance" may be available. This is an area in which hair splitting and nit picking has been elevated to an art form. "Other insurance" clauses have been variously described as: "the catacombs of insurance policy English, a dimly lit underworld where many have lost their way,"[1] a circular riddle,[2] and "polic[ies] which cross one's eyes and boggle one's mind."[3]

"Other insurance" clauses are intended to apportion an insured loss between or among insurers where two or more policies offer coverage of the same risk and same interest for the benefit of the same insured for the same period. These clauses began their lives as an attempt to prevent fraud in the overinsuring of property. Now the clauses are widely used in many other types of insurance policies where fraud by overinsurance would not be a possibility. The four most common forms of "other insurance" clauses are:

> (1) the "pro rata" clause, which provides that the insurer will pay its share of the loss in the proportion its policy limits relates to the aggregate liability coverage available; (2) an "excess" clause, which provides that an insurer will pay a loss only after other available primary insurance is exhausted; (3) an "escape" clause, which provides that an insurer is absolved of all liability if other coverage is available; and (4) an "excess escape" clause, which provides that the insurer is liable for that amount of a loss exceeding other available coverage and that the insurer is not liable when other available insurance has limits equal to or great-

---

**1.** *Insurance Co. of North America v. Home & Auto Ins. Co.*, 256 Ill. App.3d 801, 195 Ill.Dec. 179, 180, 628 N.E.2d 643, 644 (Ill.Ct.App. 1993).

**2.** Linda Hasse, *Is There a Solution to the Circular Riddle? The Effect of "Other Insurance" Clauses on the Public, the Courts and the Insurance Industry*, 25 S.D.L.Rev. 37 (1980).

**3.** *Columbia Cas. Co. v. Northwestern Nat'l Ins. Co.*, 231 Cal.App.3d 457, 282 Cal.Rptr. 389, 396 (1991).

er than its own.[4]

Each type of clause has its own rules of construction and when these clauses compete with each other, the rules of interpretation become more complex.

In the present matter we have two policies which (I) cover the same risk—3 buildings at Mike Smith Chevrolet, (2) cover the same interest—commercial property, (3) are for the benefit of the same insured—Mike Smith Chevrolet, (4) apply for the same time period—September 21–22, 1989. Each policy's "other insurance" clause is identical, providing:

> "If there is other insurance covering the same loss or damage .... we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance whether you can collect on it or not. But we will not pay more than the applicable limit of insurance."

Thus, in this matter we have a competition between two "excess" "other insurance" clauses, each of which attempts to make its policy excess to all other available coverage. Additionally, the USF & G policy styles itself as "blanket commercial property coverage" detailing coverage for specified properties at several different dealerships, including Mike Smith–Myrtle Beach, whereas the SCIC policy is a specific policy only for the Mike Smith Myrtle Beach location.

The question presented to us is framed as one involving blanket versus specific policies. For the reasons we outline in this opinion, we believe the more proper analytical framework to be that of resolving competing "excess" "other insurance" clauses.

That having been said, if the blanket/specific analysis is used, there are at least two schools of thought concerning the apportionment of losses covered under both blanket and specific policies. One school of thought finds that blanket policies are intended only to supplement specific policies and that, therefore, the policy limit of a specific policy must be exhausted before the blanket policy provides any coverage, without regard to any policy language concerning apportionment of

---

4. Douglas R. Richmond, *Issues and Problems in "Other Insurance," Multiple Insurance, and Self Insurance,* 22 Pepp.L.Rev. 1373, 1381 (1995), an excellent, comprehensive analysis of this topic in the context of property as well as liability insurance.

other insurance. *See* John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 3912 (1972) ("A blanket or floating policy is only intended to supplement specific insurance, and it cannot become operative until the specific insurance has become exhausted."); *see also, e.g., Hennes Erecting Co. v. National Union Fire Ins. Co.,* 813 F.2d 1074 (10th Cir.1987) (citing general rule that specific policy must be exhausted before blanket/floater policy can provide coverage); *USAA v. United States Fidelity & Guaranty Co.,* 555 S.W.2d 38 (Mo.Ct.App.1977) (finding that exhaustion of coverage under specific policy constituted condition precedent to right to recover under blanket/floater policy). Other cases apply an entirely different rule by holding that when blanket and specific policies insure the same entity against the same risk, they provide concurrent coverage and should be prorated. *See, e.g., Home v. Great American Ins. Co.,* 109 Ga.App. 24, 134 S.E.2d 865 (1964) (applying rule that policies insuring the same entity against the same risk should be considered concurrent even if one policy is more specific than the other).

■ Prior South Carolina precedents suggest that if two or more policies insure the same entity against the same risk to the same object, the policies are concurrent and losses should be prorated between the insurers who issued the policies. In *Lucas v. Garrett,* 209 S.C. 521, 41 S.E.2d 212 (1947), this Court found that there was no concurrent coverage under separate insurance policies where the policies did not insure against the same interest or the same casualty. *Id.* at 527, 41 S.E.2d at 215. One of the policies at issue insured against a party's legal liability, but the other policy insured against the destruction of property (bales of cotton). *Id.* Given these facts, there was no concurrent coverage. However, the clear implication of the decision is that if policies do insure the same entity and the same interest against the same casualty, then coverage is concurrent, and the loss must be prorated, at least absent policy language to the contrary.

Similarly, in *Murdaugh v. Traders & Mechanics Insurance Co.,* 218 S.C. 299, 62 S.E.2d 723 (1950), this Court found that two fire insurance policies protecting the same home did not provide concurrent coverage, because the policies did not insure the same interest. *Id.* at 310, 62 S.E.2d at 727–28. One of the policies protected the interest of the homeowner

himself, but the other policy was intended to protect the interest of the mortgagee. *Id.* at 309–10, 62 S.E.2d at 727–28. Again, *Murdaugh* implies that if policies insure the same entity and interest against the same casualty, then the coverage provided by the policies is concurrent, thus requiring pro rata contribution absent a contrary provision in an "other insurance" clause contained in one of the policies.

■ *Lucas* and *Murdaugh* suggest that the only prerequisite to proration of a loss among multiple insurers is that all policies concerned provide coverage for the same peril to the same property and interest, a condition that is indisputably satisfied here. Those cases, however, do not squarely address whether a distinction should be made between the kind of coverage provided by blanket and specific policies, such that a blanket policy should *always* be considered excess to more specific insurance. We must now address that issue.

■ We do not favor a rule that creates a wooden distinction between "blanket" and "specific" policies, because such a distinction will often fail to effectuate the intent of the insurer and the insured as to coverage. As we view it, courts faced with the distasteful chore of apportioning liabilities among multiple insurers should look to the language of the policies to ascertain whether the policies are intended to provide *primary* or *secondary* coverage. In other words, the relevant question is not whether a policy is blanket or specific, but what is the "total policy insuring intent" embodied within the policy. *See, e.g., Allstate Ins. Co. v. Frank B. Hall & Co.,* 770 P.2d 1342, 1346 (Colo.Ct.App.1989). For example, if both policies provide coverage for the same peril to the same property and interest, and both contain language evincing an intent to provide primary coverage, that one policy may be somewhat more specific than another usually should make no difference. *See, e.g., Harbor Ins. Co. v. USAA,* 114 Ariz. 58, 559 P.2d 178 (Ct.App.1976) (rejecting position that coverage of general homeowners' liability policy should be considered secondary to more specific coverage of motor vehicle liability policy); *see also State Farm Fire & Cas. Co. v. LiMauro,* 65 N.Y.2d 369, 492 N.Y.S.2d 534, 537, 482 N.E.2d 13, 16 (1985) ("As our case law has developed, it has rejected as an exercise in 'meaningless semantics' the effort to determine which

among policies covering the risk which occurred is the more specific, but recognized the right of each insurer to rely upon the terms of its own contract with its insured.").

■ One method insurance companies use to indicate whether they intend to provide primary, secondary, or other coverage is to include in their policies "other insurance" clauses that attempt to apportion liability among multiple insurers. An "excess" clause, the most common kind of "other insurance" clause, provides that a policy will cover only amounts exceeding the policy limits of other insurance covering the same risk to the same property. When two policies both contain "excess" clauses, most courts have regarded the clauses as mutually repugnant and have treated both policies as primary, ordering proration of the loss. *See, e.g., Indiana Ins. Co. v. Mission Nat'l Ins. Co.,* 874 F.2d 631 (9th Cir.1989) (Under Washington law, where both policies contain "excess" "other insurance" provisions, clauses are mutually repugnant, and the loss must be prorated.); *Universal Underwriters Ins. Co. v. Allstate Ins. Co.,* 99 Md.App. 595, 638 A.2d 1220 (1994) (Where two "excess" clauses are applicable and directly conflict, they must be disregarded as mutually repugnant, and each policy is treated as primary insurance.). Generally, we agree that, in many cases, "excess" "other insurance" clauses should cancel each other out, because two policies with such clauses cannot *both* be treated as "excess" policies.

However, this rule should not apply "when its use would distort the meaning of the terms of the policies involved." *LiMauro,* 492 N.Y.S.2d at 538, 482 N.E.2d at 17. The total policy insuring intent of the parties always should remain the central issue in apportioning liabilities among multiple insurers. Although the wording of "other insurance" clauses is a relevant factor in determining the total policy insuring intent of an insurer and its insured, the "other insurance" clause constitutes only one factor among many to be considered. Other pertinent factors for the Court to consider in ascertaining the purpose an insurance policy is intended to serve include (1) the stated coverage provided in the policy, (2) the premium paid for such coverage, (3) any requirements in the policy that the insured have underlying insurance policies, and (4) other relevant factors. *See, e.g., LiMauro,* 65 N.Y.2d 369, 492 N.Y.S.2d 534, 482 N.E.2d 13.

In *LiMauro,* the New York Court of Appeals was faced with the task of determining the priority of liability among three automobile insurance policies.[5] One of the policies indisputably provided primary coverage, so the New York court only had to resolve whether the amount of the loss exceeding the limits of the primary policy should be prorated between the other two insurers, Aetna and State Farm, or whether the limits of Aetna's policy had to be exhausted before State Farm's policy bore any liability.

One of the policies at issue was a "family automobile policy" with coverage of $100,000 per person and $300,000 per accident for accidents caused when the insured driver was driving a non-owned vehicle. This policy ("the Aetna policy") contained an "other insurance" clause providing that coverage for accidents involving non-owned or temporary substitute vehicles would be excess over any other valid and collectible insurance. *Id.,* 492 N.Y.S.2d at 539–40, 482 N.E.2d at 19. The other policy at issue ("the State Farm policy") was designated a "success protector policy" and contained a liability limit of $1,000,000, covering "personal injury or property damage arising out of operation of an automobile, watercraft or aircraft or of business or rental property, and as to the operation of an automobile covered not only the named insured but also any person operating the vehicle with, and within the scope of, the consent of the named insured." *Id.,* 492 N.Y.S.2d at 536, 482 N.E.2d at 15–16. Aetna argued that the "excess" clause in its policy made its coverage secondary to that of the State Farm policy.

The New York Court of Appeals disagreed. It instead determined that the State Farm coverage should be excess to any coverage provided by the Aetna policy notwithstanding the "other insurance" provision in the Aetna policy. The court found that the following features of the State Farm policy

**5.** Although there are some jurisdictions in which the rules for interpreting "other insurance" clauses in automobile insurance policies are different from those applicable to other types of liability and property insurance policies, the framework we adopt here of examining "total policy insuring intent" will apply to all "other insurance" clauses without regard to policy type.

evinced an intent by State Farm and its insured that coverage was to be truly excess to other collectible insurance:

- The State Farm policy specified that it provided coverage only in excess of the total limit of liability of any underlying insurance collectible by the insured.

- The policy required the insured to maintain underlying automobile liability insurance in minimum amounts of $100,000/$300,000.

- The policy contained an "other insurance" clause providing that its coverage would be excess to all insurance except insurance purchased to apply "in excess of the sum" of the coverage provided by both the underlying insurance and the State Farm policy.

- The State Farm policy provided $1,000,000 coverage at a premium of $144 as compared to Aetna's policy, which provided $100,000/$300,000 coverage for a premium of $119. The court found that the small premium for the large amount of coverage provided by State Farm indicated State Farm intended to insure "at a lesser level of risk than did Aetna."

*Id.,* 492 N.Y.S.2d at 541, 482 N.E.2d at 19–20. The court examined the Aetna policy and concluded that it generally was intended to provide primary coverage and that the "excess" clause evinced Aetna's intent that its coverage be excess only to other *primary* coverage on non-owned automobiles, not to coverage that was *inherently* excess or secondary, like that of the State Farm policy. *Id.,* 492 N.Y.S.2d at 539–40, 482 N.E.2d at 19. Accordingly, the court required exhaustion of the Aetna policy prior to any contribution by the State Farm policy. *Id.,* 492 N.Y.S.2d at 540–41, 482 N.E.2d at 20.

When we examine the commercial property portions of the policies at issue in this case, it is clear that the SCIC policy and the USF & G policy provide the same kind of coverage. As we view it, both policies (absent their "excess" clauses) appear to provide primary coverage. Most significantly here, neither policy requires the insured to possess "underlying insurance" as to the commercial property coverage, which

many strictly "excess" policies require. In fact, the coverage terms of the two policies are quite similar. The commercial property portions of the policies differ primarily in that the USF & G policy covers more buildings at more locations. We do not think this difference should free USF & G from its obligation to its insured.

■ The SCIC and USF & G policies contain identical "excess" "other insurance" clauses. Like the "excess" clause in the Aetna policy in *LiMauro,* the "excess" clauses in the SCIC and USF & G policies evince only an intent that coverage be excess to that of other inherently primary policies. Obviously, it is impossible to give effect to both "excess" clauses, and given that there is nothing else in the policies that differentiates the kind of coverage they provide, the clauses should be disregarded as mutually repugnant and the loss should be prorated between SCIC and USF & G according to their respective policy limits. *See* 44 Am.Jur.2d *Insurance* § 1791 (1982 & Supp.1995) ("Proration has not been universally compelled between liability insurers both of whose policies contain 'excess insurance' provisions, although it has been compelled in a great majority of cases."); *see also, e.g., Home Ins. Co. v. Certain Underwriters,* 729 F.2d 1132 (7th Cir.1984) (where "excess" clauses are mutually repugnant, each insurance company is liable for pro rata share of the total liability); *Kansas City Fire & Marine Ins. Co. v. Hartford Ins. Group,* 57 N.Y.2d 920, 456 N.Y.S.2d 760, 442 N.E.2d 1271 (1982) (mutual "excess" policies covering the same risk cancel each other out, and contribution by both insurers is required); Paul R. Koepff, *"Other Insurance" Clauses,* PLI's 13th Annual Insurance, Excess and Reinsurance Coverage Disputes, 539 PLI/Lit 249 (1996) (summarizing general rules concerning "other insurance" clauses).

Accordingly, under South Carolina law, the policies' "excess" clauses are mutually repugnant, both policies provide primary coverage, and the loss with regard to the three buildings covered by both policies should, therefore, be prorated between SCIC and USF & G according to their respective policy limits.

CONCLUSION

█ We find that in determining whether a loss covered by multiple insurers should be prorated, or whether one policy should be treated as an "excess" policy, courts in South Carolina should consider the "total policy insuring intent" based on all the language of the insurance policies at issue. If two policies both contain "excess" clauses, but otherwise appear to provide for primary coverage, the excess clauses should be disregarded, and the concurrently covered loss prorated according to the policy limits of the respective policies.

We would be hard pressed to improve upon this conclusion penned by the Kentucky Court of Appeals:

> This opinion represents our honest effort to make detailed answers to the conflicting arguments of the parties relative to the construction of an insurance policy. It would be somewhat ludicrous for us to say this policy is not ambiguous. It is. But no more so than most others. Ambiguity and incomprehensibility seem to be the favorite tools of the insurance trade in drafting policies. Most are a virtually impenetrable thicket of incomprehensible verbosity. It seems that insurers generally are attempting to convince the customer when selling the policy that everything is covered and convince the court when a claim is made that nothing is covered. The miracle of it all is that the English language can be subjected to such abuse and still remain an instrument of communication. But, until such time as courts generally weary of the task we have just experienced and strike down the entire practice, we feel that we must run with the pack and attempt to construe that which may well be impossible of construction.

*Universal Underwriters Insurance Company v. Travelers Insurance Co.,* 451 S.W.2d 616, 622–23 (Ky.Ct.App.1970).

**CERTIFIED QUESTION ANSWERED.**

FINNEY, C.J., and MOORE, WALLER and BURNETT, JJ., concur.