# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-2867, 03-2868, 03-3550

TACO BELL CORPORATION,

                      *Plaintiff-Appellee/Cross-Appellee*,
                      *v.*

CONTINENTAL CASUALTY COMPANY,

      *Defendant-Third Party Plaintiff-Appellee/Cross-Appellant*,

                      *v.*

ZURICH AMERICAN INSURANCE COMPANY,

             *Defendant-Third Party Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 01 C 0438—**Harry D. Leinenweber**, *Judge*.

_____

ARGUED SEPTEMBER 27, 2004—DECIDED NOVEMBER 5, 2004

_____

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. Taco Bell has sued two insurance
companies, Zurich and Continental, each of which had issued
it a liability-insurance policy. The basis of federal jurisdiction

is diversity of citizenship, and the substantive issues are governed, the parties tacitly agree, by Illinois law. The suit seeks a declaration that the insurance companies have a duty to pay for Taco Bell's defense against a diversity lawsuit that has been brought against it in a federal district court in Michigan by a design agency named Wrench. (That suit has already given rise to nine judicial opinions, beginning with *Wrench LLC v. Taco Bell Corp.*, 1998 WL 480871 (W.D. Mich. 1998), and is still going strong.) Taco Bell settled with Continental. The district court, on summary judgment, awarded the declaratory relief sought by Taco Bell—and despite the settlement awarded it against Continental as well as Zurich. The court also ordered Zurich to pay Taco Bell $142,000 for defense costs already incurred by the latter in the Wrench litigation and an additional $45,000 for the cost to Taco Bell of litigating this declaratory-judgment suit against Zurich. Finally, the court ordered Zurich to pay Continental $1.8 million, representing one-half the Taco Bell defense costs that Continental had paid. (We have rounded off the dollar figures.) Zurich appeals, as does Continental, which would like the judgment against it vacated and also would like Zurich to be ordered to pay a larger share of Taco Bell's defense costs.

The amended complaint in Wrench's suit (now on appeal to the Sixth Circuit after the award of substantial damages to Wrench) alleges the following: In 1995 Wrench developed a marketing gimmick that it called "Psycho Chihuahua," which "involved the image of a clever, feisty Chihuahua dog with an attitude," the idea being "to use the humor of seeing a small dog character with a big dog's attitude." At a trade show the following year, Taco Bell expressed interest in using the design to promote its restaurants. Wrench proposed to Taco Bell "an advertising campaign based on a Chihuahua with an attitude obsessed with Taco Bell food, describing the Chihuahua to be used in the campaign as edgy and feisty, with a spicy Mexican personality and an insatiable craving for Taco Bell food." Beginning in the summer of 1997, Taco Bell, without obtaining

permission from Wrench, began running television commercials on the theme of "a Chihuahua obsessed with the thought of Taco Bell food to the exclusion of anything else, including a female Chihuahua." What is more, the next year Taco Bell based its entire national advertising campaign on "the same basic idea of a Chihuahua with an attitude that is obsessed with Taco Bell food. Taco Bell has also used several of the specific commercial ideas provided by [Wrench] in its campaign, including the idea of using a live dog manipulated by computer graphic imaging, the idea of having a boy Chihuahua passing up a girl Chihuahua for Taco Bell food, the idea of using a bobbing head doll in a commercial, the idea of having a Chihuahua sneaking into the rear window of a car to obtain Taco Bell food, the idea of a Chihuahua popping his head out through a hole at the end of a commercial, and the idea of using a consistent tag line at the end of every commercial to keep the Chihuahua as a consistent icon for Taco Bell." These alleged appropriations of Wrench's design ideas are, so far as bears on our case, charged as misappropriation in violation of the common law of Michigan.

The insurance policies that Continental and Zurich issued to Taco Bell were similar but covered occurrences in different periods. Continental's covered the period January 1, 1997, to October 6, 1997, and Zurich's ran from October 7, 1997, to the end of 1998. Both policies covered "advertising injury," defined in both as "injury arising out of paid announcements in the . . . broadcast media resulting from . . . misappropriation of advertising ideas or style of doing business." It is apparent that Wrench's complaint charges advertising injury. But Zurich appeals to the policy exclusion for advertising injury "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." The first "Chihuahua" ads ran before the coverage under Zurich's policy began, and Zurich argues that therefore Taco Bell's entire Chihuaha-inspired advertising campaign, most of which occurred later, had first been published before the policy took effect; if so, Zurich is off the hook.

The purpose of the "prior publication" exclusion (a common clause in liability-insurance contracts, though rarely litigated) can be illustrated most clearly with reference to liability insurance for copyright infringement. Suppose a few months before insurance coverage began on October 7, 1997, the insured published an infringing book that it continued selling after October 6. The "prior publication" exclusion would bar coverage because the wrongful behavior had begun prior to the effective date of the insurance policy. The purpose of insurance is to spread risk—such as the risk that an advertising campaign might be deemed tortious—and if the risk has already materialized, what is there to insure? *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 716 (S.D. Tex. 2000). The risk has become a certainty. That would be true in this case had Taco Bell during the period covered by Zurich's policy just rebroadcast the commercials it had broadcast before October 7, 1997.

The later commercials were different from the earlier ones, however, though that in itself need not be decisive. Suppose a magazine article that infringed copyright and was published before the policy period began was republished later as part of an anthology. The anthology would be a different, probably a much different, work from the magazine, but the wrongful act—the copying of the copyrighted article without authorization—would be the same and so the prior-publication exclusion would, we believe (we can find no reported cases on the question), click in. Zurich argues in like vein that while the commercials broadcast after October 6 were different from the earlier ones, they used the same misappropriated design, namely the idea of the Chihuahua with attitude, etc.

Zurich is wrong. Wrench's complaint alleges—and the duty of an insurance company to defend against a suit against its insured is determined by the allegations of the complaint in that suit rather than by what is actually proved, *Dixon Distributing Co. v. Hanover Ins. Co.*, 641 N.E.2d 395, 398 (Ill. 1994); *American Alliance Ins. Co. v. 1212 Restaurant Group, L.L.C.*, 794 N.E.2d 892, 897 (Ill. App. 2003); *Roman Catholic Diocese v.*

*Maryland Casualty Co.*, 139 F.3d 561, 565 (7th Cir. 1998) (Illinois law)—that those later commercials appropriated not only the "basic idea" ("Psycho Chihuahua") but other ideas as well that are protected by Michigan's common law of misappropriation, like the idea of the Chihuahua's poking its head through a hole at the end of the commercial. This is a modest idea. Who knows whether it's really protected by Michigan law (there are no cases on point other than the district court decision in Wrench's suit, which as we said is currently on appeal) yet not preempted by federal copyright law. But that is not the issue. The charge of misappropriation of the idea of the Chihuahua's head popping out of a hole is a *claim* of advertising injury, meritorious or not; and Taco Bell bought insurance against having to pay the entire expense of defending against such claims.

At some point a difference between the republished version of an unlawful work and the original version would be so slight as to be immaterial. See *Ringler Associates Inc. v. Maryland Casualty Co.*, 96 Cal. Rptr. 2d 136, 150 (App. 2000); *P.J. Noyes Co. v. American Motorists Ins. Co.*, 855 F. Supp. 492, 495 (D.N.H. 1994). But that observation cannot save the insurer when the republication contains new matter that the plaintiff in the liability suit against the insured alleges as fresh wrongs. Wrench's complaint claims that Taco Bell stole the "basic idea" before October 7, 1997, and used it in its earliest commercials, which predated Zurich's coverage, but that it stole additional, subordinate but still protected, ideas as well and incorporated them into the later commercials.

The only thing that gives the slightest color to Zurich's invocation of the "prior publication" exclusion is a certain vagueness in the misappropriation tort compared to copyright infringement. The copyright infringer copies an expressive work (or a significant part of it) that is "fixed in any tangible medium of expression," 17 U.S.C. § 102(a); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994); *Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624, 632 (2d Cir. 2004), and

that therefore has pretty definite metes and bounds. The misappropriator, or at least this alleged misappropriator, takes an idea; and the boundaries of an idea can be quite uncertain. If Wrench's idea of a "Psycho Chihuahua" advertising campaign is defined broadly enough, it encompasses all the subordinate ideas embodied in the later commercials. But this possibility is irrelevant. We repeat that the duty to defend is determined by what is charged in the complaint. Wrench's complaint charges the misappropriation of the subordinate ideas as separate torts, and those torts occurred during the period covered by Zurich's policy.

Zurich has other strings to its bow, however. Its policy requires the insured to notify it "promptly" of an event that might trigger liability under the policy (an "occurrence," in insurance-speak), and adds that "in the event of noncompliance" with the requirement Zurich "shall not be required to establish prejudice resulting from noncompliance but shall be automatically relieved of liability with respect to the claim." Wrench filed its suit against Taco Bell on January 16, 1998; Taco Bell didn't notify Zurich of the suit until June 8, 1998, four and a half months later.

An insurer wants to be notified of a suit against its insured as soon as possible, to give it ample time to investigate the case, determine whether its duty to defend has been triggered, and if so prepare the defense of the case: hence "promptly." And it doesn't want to have to prove "prejudice," and needn't do so even if the policy doesn't explicitly excuse such proof, as it did here. *Northbrook Property & Casualty Ins. Co. v. Applied Systems, Inc.*, 729 N.E.2d 915, 922 (Ill. App. 2000); *American Country Ins. Co. v. Bruhn*, 682 N.E.2d 366, 370 (Ill. App. 1997); *Hartford Accident & Indemnity Co. v. Rush-Presbyterian-St. Luke's Medical Center*, 595 N.E.2d 1311, 1314-16 (Ill. App. 1992); *Highlands Ins. Co. v. Lewis Rail Service Co.*, 10 F.3d 1247, 1249-50 (7th Cir. 1993) (Illinois law). Yet these cases are explicit that Illinois law, albeit rather in the teeth of the wording of the notice clauses in insurance policies, makes the prejudice to the insurer from late notice "a factor in assessing the reasonable-

ness of the notice," unless the delay is extreme, as in *Northbrook Property & Casualty Ins. Co. v. Applied Systems, Inc.*, *supra,* 729 N.E.2d at 920 (17 months), and *General Casualty Co. v. Juhl*, 669 N.E.2d 1211, 1214-15 (Ill. App. 1996) (13 months); see also *Highlands Ins. Co. v. Lewis Rail Service Co.*, 10 F.3d 1247, 1250 (7th Cir. 1993) (6 years). This result can be defended by reference to the general principle of contract law that breaches that are technical, harmless, and therefore "immaterial" do not allow the "victim" of the breach to walk away from the contract to the great harm of the party that committed the harmless breach. E.g., *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (Illinois law); *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714-15 (7th Cir. 1993) (Illinois law); cf. *Jacob & Youngs, Inc. v. Kent*, 129 N.E. 889 (1921) (Cardozo, J.). For that would be a disproportionate sanction contrary to commercial custom and unlikely to have been actually intended by the parties. So, since the delay here was modest, Zurich can invoke the notice clause only if there is some evidence that it suffered at least some prejudice from Taco Bell's delay.

It argues that it did because the commercials continued to run during the four and a half months that elapsed between Wrench's suit and the notification of the suit to Zurich, and if only it had known about the suit it would have taken steps to prevent Taco Bell from continuing to run the commercials. But what steps could it have taken? The insurance policy didn't authorize it to review Taco Bell's commercials and if it thought them tortious force Taco Bell to yank them. If Taco Bell was willing to take the risk of liability to Wrench by continuing to run the commercials after Wrench sued—as it was—why would it have desisted at Zurich's urging? Maybe it would have done so had Zurich said it wouldn't defend the suit otherwise, though we know that this would have been an empty threat. But the decisive fact is that that when Zurich did receive notice of the litigation, it took no steps to try to make Taco Bell cancel the commercials even though they were continuing to run and thus increasing Wrench's damages and

therefore also Zurich's potential liability to Taco Bell on the insurance policy. There is no reason to suppose that if Zurich had received notice earlier it would have taken such steps; its incentive would not have been much greater, though a little greater because more of the injury to Wrench and the resulting liability of Taco Bell and derivately of Zurich would have lain in the future.

We conclude that Zurich's defenses to its duty to defend fail. But Zurich has three complaints that we have now to consider about the amount of defense costs that it has been ordered to pay Taco Bell and Continental. The first has to do with a self-insured retention clause in Zurich's policy. Only after Taco Bell paid the first $2 million of defense costs would Zurich's duty to pay kick in. There was no similar provision in Continental's policy. Taco Bell has incurred defense costs of some $5.8 million, of which more than $3.5 million have been paid by Continental, and the district court ordered Zurich to reimburse Continental for one-half of the excess of those costs over the $2 million retention, or (roughly, for remember that we're rounding off dollar figures) $1.8 million. Zurich argues that what the court should have done was to divide the total defense costs in half (this on the assumption, which we examine later, that 50-50 is the proper method of allocating defense costs between the two insurers) and then subtract the retention from Zurich's share. That would yield a figure for reimbursement to Continental not of $1.8 but of $.8 million ($2.8 million—$2.0 million), which would require an adjustment in Zurich's favor of $1 million.

Zurich is right. Taco Bell agreed that it would pay the first $2 million of any defense costs for which Zurich would otherwise be responsible. Were there no retention provision, Zurich would be responsible, under the district court's 50-50 method of allocation, for $2.8 million in defense costs. But the retention provision cut this by $2 million. Continental did not negotiate a self-retention provision and is not entitled to benefit from Zurich's provision.

Next Zurich complains about the amount of defense costs incurred by Taco Bell. Zurich submitted an affidavit by a firm that hires itself out to review lawyers' bills and that opined that Taco Bell had overpaid the lawyers who represented it in the *Wrench* litigation. We are unimpressed, as was the district court. When Taco Bell hired its lawyers, and indeed at all times since, Zurich was vigorously denying that it had any duty to defend—any duty, therefore, to reimburse Taco Bell. Because of the resulting uncertainty about reimbursement, Taco Bell had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review. *Kallman v. Radioshack Corp.*, 315 F.3d 731, 742 (7th Cir. 2002); *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 200 F.3d 518, 520 (7th Cir. 1999); *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996); cf. *Blum v. Stenson*, 465 U.S. 886, 892-96 (1984). The affidavit of the firm that picked through Taco Bell's legal bills is excruciatingly detailed. The amount of time and money that went into its preparation and would be incurred in adjudicating its accuracy probably exceeds the potential excesses that it identifies.

Although the cases that we have just cited are all diversity cases arising in Illinois, none discusses Illinois law; and Zurich points us to *Kaiser v. MEPC American Properties, Inc.*, 518 N.E.2d 424, 427-28 (Ill. App. 1987), which holds that even in a case in which fee shifting is specified in a contract that does not in so many words limit the entitlement to "reasonable fees," not only must the party asking for an award of fees prove that they are reasonable but in addition "the petition for fees must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor. Because of the importance of these factors, it is incumbent upon the petitioner to present detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." This was said in general, rather than with specific reference to a case in which there is an adequate market test of the fees. But what is

more important is that even in a diversity suit the require-ments of proof are governed by federal rather than state law. "The decision to hold an evidentiary hearing when making an attorney's fee award is a matter of procedure, and is therefore governed by federal law under the *Erie* doctrine." *Shakey's, Inc. v. Covalt*, 704 F.2d 426, 435 (9th Cir. 1983); see also *Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995); *Karl's, Inc. v. Sunrise Computers, Inc.*, 21 F.3d 230, 232 (8th Cir. 1994); *Schafler v. Fairway Park Condominium Ass'n*, 324 F. Supp. 2d 1302, 1309-12 (D. Fla. 2004); but see *Security Mutual Life Ins. Co. of New York v. Contemporary Real Estate Associates*, 979 F.2d 329, 331-32 (3d Cir. 1992). (That is why the Seventh Circuit cases cited earlier, though diversity suits, did not discuss state law.) For they concern how a particular court system, having regard for its resource constraints and the competing claims on its time, balances the cost of meticulous procedural exactitude against the benefits in reducing error costs.

Furthermore, although Zurich's policy entitled it to assume Taco Bell's defense, in which event Zurich would have selected, supervised, and paid the lawyers for Taco Bell in the Wrench litigation, it declined to do so—gambling that it would be exonerated from a duty to defend—with the result that Taco Bell selected the lawyers. Had Zurich mistrusted Taco Bell's incentive or ability to economize on its legal costs, it could, while reserving its defense that it had no duty to defend, have assumed the defense and selected and supervised and paid for the lawyers defending Taco Bell in the Wrench litigation, and could later have sought reimbursement if it proved that it had indeed had no duty to defend Taco Bell. *Clemmons v. Travelers Ins. Co.*, 430 N.E.2d 1104, 1109 (Ill. 1981); *General Agents Ins. Co. of America, Inc. v. Midwest Sporting Goods Co.*, 812 N.E.2d 620 (Ill. App. 2004). So presumably it had some confidence in Taco Bell's incentive and ability to minimize legal expenses. We add that the duty to defend would be significantly undermined if an insurance company could, by the facile expedient of hiring an audit firm to pick apart a law firm's billing, obtain an eviden-tiary hearing on how much of the insured's defense costs it

had to reimburse. Cf. *Charter Oak Fire Ins. Co. v. Hedeen & Cos.*, 280 F.3d 730, 739 n. 4 (7th Cir. 2002); *Willis Corroon Corp. v. Home Ins. Co.*, 203 F.3d 449, 453 (7th Cir. 2000).

Last, Zurich complains about being ordered to reimburse the expenses that Taco Bell incurred in obtaining a declaration that Zurich was indeed obligated to defend against Wrench's suit. In *Green v. J.C. Penney Auto Ins. Co.*, 806 F.2d 759 (7th Cir. 1986), we held that an insurer must reimburse the insured for the expenses of obtaining a declaration that the insurer has a duty to defend or indemnify. At the time, the Illinois Appellate Court was divided on the issue, compare *Trovillion v. U.S. Fidelity and Guaranty Co.*, 474 N.E.2d 953, 958 (Ill. App. 1985), with *Tuell v. State Farm Fire & Casualty Co.*, 477 N.E.2d 70, 74 (Ill. App. 1985); *Preferred Risk Mutual Ins. Co. v. U.S. Fidelity & Guaranty Co.*, 395 N.E.2d 1180, 1184-85 (Ill. App. 1979), so we went with what we thought the better rule. Later the case on which we had relied (*Trovillion*) was overruled, *Bonnie Owen Realty, Inc. v. Cincinnati Ins. Co.*, 670 N.E.2d 1182, 1188 (Ill. App. 1996), and it became the unanimous view of that court that the standard "American rule" should apply to such cases, meaning that there was no duty of reimbursement unless the insurer had only a frivolous defense to the declaratory-judgment suit, which is not contended here. Whether to shift attorneys' fees, as distinct from the procedure used to determine whether the amount sought is reasonable, falls on the substantive side of the substantive-procedural divide created by *Erie* and subsequent decisions if though only if the decision to shift or not shift is based on a substantive state policy. Compare *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51-52 (1991); *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31(1975), and *McMahan v. Toto*, 256 F.3d 1120, 1132 (11th Cir. 2001), with *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 529 (6th Cir. 2002), and *In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 837-38 (9th Cir. 2001). So Illinois law governs the question. But Taco Bell argues that we are bound by *Green* because it is our decision, even though it's no longer a reliable

prediction of how the Supreme Court of Illinois would rule if the issue were presented to it.

What is true is that the district court was bound by *Green*, as a lower court cannot overrule the decision of a higher one. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029-30 (7th Cir. 2004). But we are not bound. The duty of a federal court in a diversity suit is to predict what the state's highest court would do if presented with the identical issue. E.g., *Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004); *Mutual Service Casualty Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001); *Private Mortgage Investment Services, Inc. v. Hotel & Club Associates, Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). In light of the Illinois Appellate Court's unanimity, the best prediction differs from what it was when *Green* was decided, and so that decision is no longer authoritative, just as in a case in which a U.S. Supreme Court decision shows that a previous decision by a lower court was unsound, even though the Supreme Court doesn't mention the decision. Cf. *Thomas v. American Home Products, Inc.*, 519 U.S. 913, 915 (1996) (Scalia, J., concurring).

We turn now to Continental's cross-appeal. Continental makes two arguments. The first is that the district judge should not have entered a judgment against it after it settled with Taco Bell. This is true. The settlement ended its dispute with Taco Bell, so there was no longer a controversy for the court to resolve. Continental therefore wants us to order the judgment vacated, and neither Taco Bell nor Zurich objects. But as the judgment has no significance, we don't see why we should vacate it. Continental has paid Taco Bell in accordance with the settlement, and the only concern Continental has expressed about the judgment is that some "third party" might notice it and do something with it. But what could a third party do with a judgment that orders Continental to do what it has already done, namely reimburse Taco Bell for defense costs? The judgment is pointless, but an order vacating it would be equally so. If we're missing something, Continental can file a motion in the district court under Fed. R. Civ. P. 60(b).

Continental argues in addition that Zurich should bear the lion's share of the defense costs because most of the offending commercials were broadcast after October 6, 1997, when Continental's policy expired. It wants those costs allocated between the insurers in the ratio that the time during the period of misappropriation in which Continental's policy was in force bears to the much longer time in which Zurich's policy was in force. But such an allocation, which would assign the lion's share of the costs to Zurich, would be even more arbitrary than the district court's 50-50 split. Had Wrench sued only in respect of the misappropriation that occurred before October 7, 1997, it is entirely speculative what fraction of the defense costs that Taco Bell ultimately incurred in defending against the suit would have been incurred. Remember that while the later commercials contain misappropriations that the earlier ones did not, such as the hole-in-the-commercial idea, those commercials also repeat the basic misappropriation—the misappropriation of the idea of a "Psycho Chihuahua" advertising campaign. Although Zurich's "prior publication" defense to its duty to defend Taco Bell from Wrench's suit has failed, probably most of the damages alleged by Wrench can be traced to what we are calling the basic misappropriation, which was published while Continental's policy was in force.

What is true though unremarked by the parties is that the ground on which the district court split the defense costs equally between the two insurers was highly questionable. The court relied on "other insurance" clauses in the two policies. An "other insurance" clause limits an insurer's liability when the risk he has insured against is also covered by another insurer's policy. *American Alliance Ins. Co. v. IARW Ins. Co., Ltd.*, 165 F.3d 558, 559-60 (7th Cir. 1999) (Illinois law); *South Carolina Ins. Co. v. Fidelity & Guaranty Ins. Underwriters, Inc.*, 489 S.E.2d 200, 202 (S.C. 1997). If two insurers have identical other-insurance clauses in policies that cover the same risk, a common and deliciously simple solution is to divide the liability between them 50-50. *North American Specialty Ins. Co. v.*

*Liberty Mutual Ins. Co.*, 697 N.E.2d 347, 349 (III. App. 1998); *U.S. Fidelity & Guaranty Co. v. Alliance Syndicate Inc.*, 676 N.E.2d 278, 280 (III. App. 1997), though there are other possibilities. *South Carolina Ins. Co. v. Fidelity & Guaranty Ins. Underwriters, Inc.*, *supra*, 489 S.E.2d at 206; 1 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes*, ch. 11 (11th ed. 2002). But this analysis does not fit the case in which the two policies, each with an "other insurance" clause, insure merely the same *kind* of risk, but not the same risk because the policies are successive. To apply "other insurance" clauses in such a case would make insurers liable in part for occurrences outside the period covered by their policies. Douglas R. Richmond, "Issues and Problems in 'Other Insurance,' Multiple Insurance and Self-Insurance," 22 *Pepp. L. Rev.* 1373, 1376-77 (1995).

As if life weren't complicated enough, however, there is an argument for treating risks in separate periods as the same risk when a single tortious act continues in successive periods, see *Continental Casualty Co. v. Hartford Fire Ins. Co.*, 116 F.3d 932 (D.C. Cir. 1997); *Federal Ins. Co. v. Cablevision Systems Development Co.*, 836 F.2d 54, 57-58 (2d Cir. 1987)—and while each of Taco Bell's Chihuahua commercials involved multiple alleged appropriations some of which occurred only in the second period (that is, the period of Zurich's policy), all the commercials contained an appropriation of the basic idea ("Psycho Chihuahua"). We need not chase this particular hare to ground, however, as the parties have not suggested any better method of dividing the costs between the two insurance companies in the circumstances of utter uncertainty prevailing here than doing so 50-50. Continental's proposed "time on the risk" allocation is even less attractive, for the reason indicated earlier, that most of Wrench's damages probably stemmed from the republication of the basic idea for the Psycho Chihuahua advertising campaign. So we won't disturb the district court's allocation.

To summarize, Zurich is entitled to a $1 million reduction in the amount that it must reimburse Continental and a $44,935.75 reduction in the amount that it must reimburse Taco Bell. In all other respects the judgment is affirmed.

AFFIRMED IN PART, REVERSED IN PART.


A true Copy:

Teste:


_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*