In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-3007, 09-3996

METAVANTE CORPORATION, a Wisconsin
Corporation,

*Plaintiff-Appellee,*

*v.*

EMIGRANT SAVINGS BANK, a New York
Corporation,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 2:05-cv-01221-JPS—**J.P. Stadtmueller,** *Judge.*

ARGUED APRIL 8, 2010—DECIDED AUGUST 30, 2010

Before RIPPLE, MANION and TINDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Metavante Corporation ("Metavante") originally brought an action in Wisconsin state court against Emigrant Savings Bank ("Emigrant") for breach of contract. The case was removed to the district court, and Emigrant counterclaimed for breach of contract and fraud. Following a bench trial, the dis-

trict court entered judgment for Metavante on all claims.[1] Emigrant appealed.

While the appeal on the merits was pending, Metavante filed, in the district court, a petition for fees and costs pursuant to a fee-shifting provision of the contract. The district court granted the petition in full. We consolidated the appeal of the fee award with the appeal of the merits. For the reasons set forth in this opinion, we affirm the judgment of the district court.[2]

# I

# BACKGROUND

## A.

Emigrant, founded in 1850, chose to expand its business by launching an on-line, direct bank, to be known as EmigrantDirect. Rather than develop the on-line system in-house, Emigrant decided to outsource this operation. Consequently, in 2004, it searched for a vendor to provide the on-line technology. Ted Morehouse, Emigrant's Senior Vice President of Marketing, testified that the bank's IT director, Dennis Healy, recommended Metavante, a vendor that provides electronic banking

---

[1] The jurisdiction of the district court was based on diversity of citizenship. *See* 28 U.S.C. § 1332.

[2] Our jurisdiction is based on 28 U.S.C. § 1291.

services and products to financial institutions.[3] Mr. Healy offered to have someone from Metavante call Mr. Morehouse; consequently, Barry Holst made contact with Emigrant in February 2004.

In March 2004, Mr. Holst, along with others from Metavante, visited Emigrant. The Metavante team gave a PowerPoint presentation which referred to Metavante as "[t]he most complete offering of scalable, integrated solutions for financial services providers," and noted its ninety million accounts processed and nine billion financial transactions. Ex. 1063 at EMI-0014995.[4] As a result of this presentation, Mr. Morehouse was confident that he would not have to worry about volume-related system problems. The same PowerPoint, however, listed "Application processing/account opening (workflow)" as a "Related Project[]/Initiative[]" of Metavante. *Id.* at EMI-0015002. Mr. Morehouse testified that he did not recall asking what was meant by that term, although he did acknowledge that he knew that "certain applications" were still being developed and that he "was willing to live with it because [he] thought they would be completed and in place well before we launched." R.569 at 226. Mr. Morehouse admitted that

---

[3] Emigrant also considered another company called Sanchez Corporation. Sanchez ultimately was not selected, in part because it outsourced a number of its functions.

[4] The record contains two sets of exhibits. One set, Metavante's exhibits, is denominated "PX." The other, Emigrant's exhibits, is simply denominated "Ex."

he knew by June that on-line account creation did not "have some of the automation that we wanted." *Id.* at 204. He admitted, however, that Emigrant "entered into the technology outsourcing agreement knowing that the on-line account creation was in a state of progress and would require further development for what Emigrant wanted." *Id.* at 209.

Metavante subsequently circulated a proposal. The proposal stated, in part, that "Metavante offers a truly integrated banking system, fully scalable to large volumes, yet modular in nature. This scalable platform processes nearly 90 million accounts each and every night." R.522 ¶ 22. According to Mr. Morehouse, the proposal's reference to existing clients that fit the direct bank profile and its general use of the present tense together indicated that Metavante's product already existed. The proposal also stated that "[o]n occasion Metavante has made the determination that purchasing niche products with advanced capabilities made more sense than developing these systems. However, even in these situations Metavante has made it a top priority to build integration into these products so that customers on the Metavante core applications can continue to enjoy the integration they expect." Ex. 1067 at EMI-0003078-79. Metavante offered as a reference another of its clients, Capital One, and Emigrant spoke to Capital One.

Over the next several months, Metavante and Emigrant negotiated a Technology Outsourcing Agreement ("the Agreement"). It was signed in August 2004. At some

point in negotiations, Emigrant requested from Metavante a flow chart describing how the system worked so that the information could be shared easily within Emigrant. Metavante provided this flow chart in July; it did not specify that its subcontractor, Teknowledge, would control one segment of the system. Mr. Holst never said anything to Mr. Morehouse "to disabuse [him] of [the] impression" that Metavante would not outsource. R.569 at 191. According to Emigrant's First Vice President John McNally, Emigrant learned in early October that Metavante outsourced part of its application to Teknowledge. R.570 at 122. According to a document from Emigrant's files, however, Emigrant knew about Teknowledge on September 14; the document in question stated that: "The customer validation pages and processing will be done through the Metavante 3rd party partner application, Teknowledge." Ex. 1134 at EMI-0025523; *see also* R.569 at 251-52.

## B.

The Agreement required Metavante to perform certain services. These included "Electronic Banking Services," which enabled users "to access, receive, collect, concentrate, and/or report data and/or initiate transactions." PX 1, Agreement § 4.5.[5] Another service was "ACH Services," by which funds would be transferred. Agreement § 4.6. Section 3.1 of the Agreement, entitled "Perfor-

---

[5] Hereinafter, we shall simply refer to the Agreement without referring to PX 1.

mance by Subcontractors," provided in part that "[c]ustomer understands and agrees that the actual performance of the Services may be made by Metavante, one or more Affiliates of Metavante, or subcontractors of any of the foregoing Entities."

The Agreement contained a performance warranty that required Metavante to provide "all Services in a commercially reasonable manner." Agreement § 6.1. The Agreement also provided that the availability of several of Metavante's services was to be evaluated according to service levels; for example, a service level of 98% availability meant that a given service had to be available 98% of the time. Anything covered by a service level was exempt from the performance warranty. Emigrant does not dispute the service levels; rather, its argument is that service levels measured only system availability. Emigrant contends that defects not resulting in outages of the system were not reflected in the service levels and were subject to the performance warranty.

The Agreement also contained a Termination Clause. Agreement § 8.2. This clause provided that a party may terminate the Agreement for cause, but also specified that the parties enjoyed broad rights to cure. Even if a default was not capable of cure within thirty days, the defaulting party could avoid termination by implementing a plan for cure. Moreover, the Agreement provided that failure to perform services as required could be cured by re-performance.

If Emigrant terminated for convenience, rather than for cause, the Agreement required that Emigrant pay a

termination fee. The Agreement provided for a re-
duced termination fee if Emigrant "migrate[d] its data
processing for direct banking to an in-house solution."
Agreement, Termination Fee Schedule, § 1(b). The Agree-
ment also contained a fee-shifting provision. Agreement
§ 17.8.[6]

## C.

EmigrantDirect launched in January 2005. The Online
Account Creation service allowed consumers to *open*
accounts, and was developed by Teknowledge,
Metavante's subcontractor. The Consumer Electronic
Banking service allowed consumers to *manage* accounts.

The EmigrantDirect system launched in January 2005
did not contain a "Good Funds Model." This Model
checks the account balance against the desired trans-
action amount to ensure that the account contains suffi-
cient funds to carry out the transaction. Without such a
model, a customer can transfer more money than is

---

[6] This provision provides:

> If any legal action is commenced in connection with the
> enforcement of this Agreement or any instrument or
> agreement required under this Agreement, the prevail-
> ing party shall be entitled to costs, attorneys' fees
> actually incurred, and necessary disbursement incurred
> in connection with such action, as determined by the
> court.

Agreement § 17.8.

available in his account. Eileen Lyon, Emigrant's First Vice President of Marketing, testified that the subject of a Good Funds Model never had been discussed during the negotiations. Mr. Morehouse testified that he was comfortable launching without a Good Funds Model because he had been assured that Emigrant could work around the problem manually. R.569 at 272-73. A year before the contract was terminated, Metavante put in place a Good Funds Model at Emigrant's request.

EmigrantDirect had other flaws. According to Kimberly Romano, EmigrantDirect's Director of Operations, customers frequently received error messages and were unable to complete on-line applications, resulting in many calls to Emigrant's call center. Emigrant undertook mitigation measures, including sending paper applications to customers. The number of customer service representatives was increased from "[s]ix or eight" to "in the 50s." R.571 at 94. Emigrant also noticed that some transactions failed to process. *Id.* at 86-87. Emigrant's expert in computer science and software assurance, Roger Nebel, testified that Metavante failed to deliver its services in a commercially reasonable manner because its system was poorly integrated, poorly tested, poorly planned, not scalable and experienced degraded service. Ms. Romano testified that she "had never seen anything like this. The fact that things were identified, supposedly cured and they were recurring, just added insult to injury." *Id.* at 172. She also testified, however, that she believed Metavante employees were trying to be helpful and were themselves frustrated about the problems. *Id.* at 105.

Despite these problems, however, EmigrantDirect acquired over 250,000 new accounts and over $6 billion in deposits in under nineteen months. Mr. Morehouse testified that before launch, Emigrant did not know whether the system would be a great success or a complete failure that would result in his firing. Mr. Morehouse admitted, however, that Emigrant blew its projections "out of the water." R.569 at 257. He also admitted that Emigrant advertised its direct bank as the most successful direct bank in the country—a proclamation he believed to be true when made.[7] The district court likewise found that EmigrantDirect was "nothing short of a home run." R.545 at 19. Metavante's expert in the performance of financial technology services agreements, David Moffat, testified that Metavante's performance was commercially reasonable, and the "most compelling fact" supporting this assertion was "the level of deposits that were achieved on this system, the number of accounts that were opened, transactions that were involved here." R.575 at 237.

Emigrant contends, however, that this success is attributable to its mitigation efforts. Not only did it hire additional customer service staff, it also employed paper

---

[7] During trial, Emigrant's damages expert, Paul Pocalyko, suggested that, despite a competitive advantage in interest rates throughout most of 2005, R.575 at 6, Emigrant's competitors earned a bigger market share than did Emigrant. *Id.* at 9. However, Pocalyko testified that Emigrant lost only one percent of the market due to Metavante's failures. *Id.* at 10.

applications, performed identity validation and checked available balances before approving external transfers.

### D.

In September 2005, Metavante sued Emigrant in Wisconsin state court for nonpayment of fees. When Emigrant was served in November, it removed the case to the district court. Around this time, Metavante sent a letter to Emigrant, providing notice of impending termination of the Agreement for nonpayment. Emigrant responded by paying the requested amount in two installments. In letters accompanying the payments, Emigrant requested Metavante's assistance in effecting "the orderly transition of Metavante's services to Emigrant." Ex. 1338. Emigrant also objected to the payments and reserved its right "to pursue all claims against Metavante." *Id.* This action prompted Metavante to amend its complaint to seek a declaratory judgment affirming its right to the payments and, in the event of termination, the termination fee.

In March 2006, Metavante again provided notice of impending termination due to nonpayment. The Agreement was not terminated. On May 3, 2006, however, Emigrant informed Metavante that it was terminating the Agreement for cause, effective the weekend of June 17, 2006. In this letter, Emigrant stated that Metavante's services had been "flawed and inadequate from inception." PX 184 at MVNT001305. Specifically, the letter referenced "Metavante's inability to prevent deposit customers from overdrafting on their accounts," the

"inability to process satisfactorily new account applications," Metavante's "continued and frequent service outages," and its inability to "determine if or when a customer's deposit transfer request to an EmigrantDirect account has in fact been completed." *Id.* The letter also referenced "the obvious failure of Metavante personnel to understand their own system," *id.* at MVNT001306, and Metavante's refusal "to provide Emigrant with timely and accurate information with respect to outages and problems with its system," *id.* at MVNT001307. The letter made much of failures the system suffered over the New Year's holiday 2006 (affecting about 6,000 customers), as well as other, more recent defects affecting about 500 customers.

In July 2006, Metavante amended its complaint to reflect breach-of-contract claims for unpaid fees from April 2006 and later. Emigrant counterclaimed that Metavante had fraudulently induced Emigrant to enter into the contract, that Metavante had intentionally misrepresented its capabilities throughout the parties' relationship and that Metavante had breached its own contractual obligations. Later, Metavante contended that Emigrant had not developed an "in-house" system, which would have entitled Emigrant to a lower termination fee. Emigrant refers to this as the "in-house claim," even though it is not, strictly speaking, a distinct "claim."

The case was tried to the bench in May 2009. Following trial, the district court ruled for Metavante on all claims in an oral decision. In relation to Emigrant's allegations of fraud, the court emphasized that Emigrant did not

raise its concerns with Metavante or otherwise "appropriately vet[]" them. R.545 at 13. The court also stated that, although there had been "hiccups" in the relationship between Metavante and Emigrant, *id.* at 18, none amounted to a material breach of the contract. It emphasized the importance of EmigrantDirect's commercial success, the testimony suggesting that a good working relationship between the parties had existed and the remarks that Emigrant CEO Howard Milstein had made to his board of directors. *See infra* at II.C.1.a. The court also noted Metavante's pursuit of unpaid fees in late 2005, which led to discussions from which the court inferred that "the parties were headed toward a relationship that would result in the agreement being terminated not for cause but for the convenience of the parties." *Id.* at 21. On the issue of whether Emigrant migrated to an "in-house" solution, the court found for Emigrant and awarded the lower termination fee.

## II

## MERITS

We now turn to the merits of this case. We shall consider Emigrant's arguments about the applicable standard of review. Then, we shall discuss Emigrant's evidentiary arguments pertaining to expert testimony offered by Metavante. We next shall turn to the contract issues, considering first, whether the district court relied on the proper factors in determining whether Metavante breached the contract, and second, whether the court's conclusion on the matter was clearly erroneous. We

shall also discuss whether Metavante breached the covenant of good faith and fair dealing. We then shall turn to Emigrant's fraud claims and consider Emigrant's claim of fraudulent inducement before turning to its claim that Metavante intentionally misrepresented its failures during the contractual relationship.

**A**.

After a bench trial, we review conclusions of law de novo and findings of fact for clear error. *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000). Provided that the trial court correctly states the law, we review for clear error the court's findings as to whether the facts meet the legal standard. Here, however, Emigrant contends that the district court's factual findings should be given no deference because they were adopted verbatim from Metavante's proposed findings and because they are internally contradictory.

We have expressed in the past our disapproval of the practice of a district court's adopting findings drafted by one party. *See W. States Ins. Co. v. Wis. Wholesale Tire, Inc.*, 148 F.3d 756, 759 n.3 (7th Cir. 1998). This view is not idiosyncratic to this court, but is a matter of federal judicial policy pointedly articulated by the Supreme Court of the United States. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985). Although we examine the district court's findings "especially critically" under these circumstances, they are still the findings of the court and are reviewed for clear error. *Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 875 (7th Cir.

1989) (internal quotation marks omitted); *see also Anderson*, 470 U.S. at 572-73; *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006) ("[I]t is entirely consistent to review a district court's conclusions for clear error, while applying that standard of review with a careful inspection of the record.").

Upon examination of the record in this case, it is clear that the district court rejected some of Metavante's proposed findings and adjusted a few others, but nevertheless adopted, on a wholesale basis, a great quantity of the proposed findings, including complete sets of findings and conclusions pertaining to certain claims. Nevertheless, our reading of the district court's oral remarks does not suggest to us that the court blindly adopted the proposed findings. *Cf. Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 797 & n.4 (7th Cir. 1981) (applying close scrutiny where district court adopted proposed findings of prevailing party without reading them). Rather, we believe that the court read the findings that it adopted and carefully considered them.

Emigrant points out two alleged contradictions between the district court's adopted findings and its oral ruling. These pertain to whether the court made a finding on damages and whether the court made a finding on Emigrant's use of Metavante's confidential information. However, neither of these two points are at issue in this appeal. Therefore, we need not decide whether the district court actually contradicted itself. This case therefore is not analogous to *Mor-Cor Packaging Products, Inc. v. Innovative Packaging Corp.*, 328 F.3d 331,

334-35 (7th Cir. 2003), where we were unable to determine the trial court's finding on the key point in the case—whether the contract at issue had been breached.

While we believe that the district court's treatment of this case is adequate, we pause to note that appellate courts and trial courts must go about their work with a concern for the overall accuracy and efficiency of the judicial process. The practice followed here, while having the superficial appeal of expediting the articulation of the district court's conclusions, creates a significant potential for inaccuracy at the trial level and great difficulty for a reviewing court that depends so much on the thoughtfulness and precision of the trial court's work product. This case involved a ten-day trial and over 500 docket entries. Oral remarks and wide-scale adoption of proposed findings hardly sharpens the issues in a way that conveys accurately the trial court's estimation to the appellate court.

## B.

Emigrant challenges part of the testimony of one of Metavante's experts, David Moffat. It contends that the testimony was unreliable, irrelevant and beyond the scope of the disclosed expert report.

Moffat, a consultant employed with Huron Consulting Group, is experienced in financial services technology and was tendered as an expert in "service levels performance and measurements in the financial services industry as well as the performance of financial tech-

nology services agreements." R.575 at 217. He testified that Metavante had performed its services in a commercially reasonable manner. In reaching that conclusion, he placed particular importance on "the level of deposits that were achieved on this system, the number of accounts that were opened, transactions that were involved," as well as Metavante's responsiveness to Emigrant's concerns and issues. *Id.* at 237.

Emigrant submits that Moffat's testimony about commercial reasonableness should have been excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under the rule established in that case, the district court was required to "ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand." *Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (internal quotation marks omitted).

Ordinarily, we review a district court's decision to admit or exclude expert testimony for abuse of discretion. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Emigrant submits, however, that the district court's failure to perform any *Daubert* analysis should deprive its ruling of the usual deference.

We agree that the district court failed to perform a *Daubert* analysis. The court, in its oral ruling, stated only that "I find nothing in Mr. Moffat's opinions to run afoul of either Rule 702 or notice requirements to opposing counsel." R.545 at 2. Although we have held that the

court in a bench trial need not make reliability determinations before evidence is presented, *In re Salem*, 465 F.3d 767, 776-77 (7th Cir. 2006), the determinations must still be made at some point. Two of our sister circuits have held that *Daubert*'s requirements of reliability and relevancy continue to apply in a bench trial. *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002). We have assumed the same. *Trs. of Chicago Painters*, 493 F.3d at 787. However, the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting, and our review must take this factor into consideration. *See Attorney Gen. of Okla.*, 565 F.3d at 779. Nevertheless, the "court must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *Gayton*, 593 F.3d at 616.

Here, we must characterize the district court's statement as conclusory. We therefore must review the admissibility of the expert testimony de novo. After our review of the record, we conclude that Moffat's testimony was both relevant and reliable.

Moffat's testimony was relevant. Neither side disputes that whether Metavante's performance was commercially reasonable was at issue. However, there was significant disagreement as to whether Emigrant's commercial success is a legitimate factor in determining whether Metavante's performance was commercially reasonable, and Moffat's testimony spoke to that ques-

tion. Moffat's testimony was designed to assist the court in assessing the reasonableness of Emigrant's assessment of Metavante's performance in a particular industry, financial services, during a transition to a new technology that would transform its way of doing business.

Moffat's testimony was sufficiently reliable to justify its admission. An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be "qualified as an expert by knowledge, skill, *experience*, training, or education." Fed. R. Evid. 702 (emphasis added); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).[8] Rule 702 does require, however, that the expert explain the "methodologies and principles" that

---

[8] Criminal cases, for instance, are replete with examples of experts, such as police officers and informants, qualified by experience. *See, e.g.*, *United States v. Goodwin*, 496 F.3d 636, 641 n.2 (7th Cir. 2007) (reiterating that "federal agents who have training and experience in drug-related transactions, crimes and prosecution are qualified to give expert testimony concerning the practices of those engaged in this type of activity" (internal quotation marks omitted)); *United States v. Gray*, 410 F.3d 338, 347 (7th Cir. 2005) (DEA agent with 7 years experience, 5 as a narcotics canine officer, qualified as an expert); *see also United States v. Vesey*, 338 F.3d 913, 916-17 (8th Cir. 2003) (holding that testimony of "a convicted drug trafficker and a confidential informant for law enforcement" should have been admitted as an expert "to present evidence of how illegal drug operations are normally conducted and to counter the testimony of the government's expert witness").

support his opinion; he cannot simply assert a "bottom line." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010); *see also United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting expert testimony where expert "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so'"). Nor may the testimony be based on subjective belief or speculation. *Trs. of Chicago Painters*, 493 F.3d at 787-88.

Moffat's testimony cannot be characterized as mere *ipse dixit.* He did not simply testify that Metavante's performance was commercially reasonable because he said so. Rather, he explained that in the financial sector, as he has seen and experienced it, businesses consider technological innovation satisfactory if it enables them to meet their business financial objective.[9] These explanations were based on Moffat's experience in the industry,

---

[9] Moffat has acquired technologies on behalf of banks and negotiated servicing on behalf of technology firms. R.575 at 219. He testified that based on that experience, "the objective is essential," because technology is "built and deployed for the purposes of meeting a business objective." *Id.* at 238. "I'm not a coder, I'm not a developer," Moffat testified, "but I'm [a] business man, in terms of my experience in this area, and the job got done." *Id.* at 250.

He also testified that when he worked for the Bank of New York, "as we saw our assets grow significantly, not unlike [Emigrant's], during the period I was there, we concluded that that was scalable, as I would conclude that this is scalable for the same reason." *Id.* at 245.

which included managing a fifty-person development team. R.575 at 275-76. In essence, Moffat testified that he was familiar with the manner in which financial services firms have evaluated technological innovations in the past and suggested that the same perspective was appropriate in the present situation. In his view, because Emigrant had met its business objectives, it should have considered Metavante's performance to have been satisfactory despite various operational problems that had arisen along the way. These "hiccups," R.545 at 18, as the district court referred to them, were to be expected along the way and should be tolerated in that industry as long as the bank's financial objectives were being realized. Therefore, Moffat's testimony based on the usual business practice is reliable.

Emigrant is, of course, critical of the quality of Moffat's testimony and does not believe that it ought to have been credited by the district court. These criticisms do not go to admissibility but to the appropriate weight that should be accorded to the evidence. As we noted in *Gayton*, "[d]etermination on admissibility should not supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross-examination." 593 F.3d at 616 (internal quotation marks omitted). The record demonstrates clearly that the district court was very much aware of this distinction and, although it admitted the evidence, it also made it very clear that, in the final analysis, it found it of limited utility in making a final determination in the case.

Emigrant also submits that Moffat's testimony about commercial reasonableness went beyond the scope of

the disclosed expert report. Rule 26(a)(2)(B)(i) of the Federal Rules of Civil Procedure requires disclosure of a written expert report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them." "The purpose of these [expert] reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). They allow attorneys, not experts in the fields at issue, to prepare intelligently for trial and to solicit the views of other experts. *S.E.C. v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009). We review the district court's ruling on a motion to exclude non-disclosed expert evidence for abuse of discretion. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 640 (7th Cir. 2008).

We are not confronted with a situation such as the one before us in *Ciomber v. Cooperative Plus, Inc.* where the expert clearly deviated from the established scope of his expected opinion. 527 F.3d 635, 641-42 (7th Cir. 2008). We believe that Moffat's supplemental expert report, combined with his original expert report, gave Emigrant sufficient information to allow it to prepare adequately for his testimony. The reports, when fairly read together, make it clear that Moffat believed that Metavante's level of performance should have satisfied Emigrant, given the level of financial success achieved by the venture.

Indeed, there is no better proof that the reports gave Emigrant adequate notice than the *very* able cross-examina-

tion of Moffat by Emigrant's counsel. Counsel stressed that Moffat was not a programmer, that Moffat did not consider "what percentage of consumers who tried to become Emigrant Direct customers were able to succeed," R.575 at 264, and that this information is a factor to consider in whether Metavante provided services in a commercially reasonable manner. *Id.* at 271. Counsel also explored Moffat's opinion on Metavante's internal communications and communications with Teknowledge, highlighting that Moffat's opinion was based on observations of others. *Id.* at 274-78. Moffat was asked to explain several of Metavante's communications, presumably to highlight what Emigrant saw as the incorrectness of Moffat's position. These lines of questioning make it clear that the district court did not abuse its discretion in determining that Emigrant had been adequately prepared for Moffat's testimony.

## C.

We turn to Emigrant's contract arguments. Emigrant submits that Metavante breached the Agreement's performance warranty and its duty of good faith and fair dealing. We shall examine each of these contentions in turn.

## 1.

Metavante warranted that it would "provide all Services in a commercially reasonable manner." Agreement § 6.1. Although some aspects of Metavante's service were

excepted from this warranty,[10] it applied to its provision of software and hardware and the design of the system.

### a.

Emigrant contends that, in considering whether Metavante provided services in a commercially reasonable manner, the district court improperly relied on the performance of EmigrantDirect in the marketplace.[11] Our review of contract meaning is de novo. What is commercially reasonable is a question of fact. *See, e.g.*, *Ford Motor Co. v. Lyons*, 405 N.W.2d 354, 376 n.16 (Wis. Ct. App. 1987) (under the UCC).

The district court did not commit any legal error in interpreting the contract language. As *Ford Motor Co. v. Lyons* illustrates, the term "commercially reasonable manner" is a commonly employed term in commercial transactions. 405 N.W.2d 354, 376 n.16 (Wis. Ct. App. 1987). The district court adopted the definition from Black's Law Dictionary of "a transaction conducted in good faith and in accordance with commonly accepted commercial

---

[10] Availability of the system was evaluated according to service levels, discussed *supra* at II.C.1.b.

[11] Emigrant also contends that the district court "misinterpreted the Agreement's termination clause to impose on Emigrant a duty of reminding Metavante that it had a right to cure defects." Appellant's Br. in 09-3007 at 43. In light of our holding that Emigrant had no basis to terminate the contract, we need not address this argument.

practice." R.545 at 17. In giving meaning to this term, the district court certainly did not err in concluding that the success of the overall venture was relevant and probative evidence. True, the performance warranty addressed Metavante's provision of technology services, not overall business performance. Nevertheless, results in the area of technology services, while not conclusive proof of reasonable performance, are an indicator that the court is entitled to take into account in making its determination. A strong overall program performance, including commercial success, suggests that the program is performing in a reasonable manner. Although it is possible that mitigation efforts would produce an extremely strong overall performance despite poor component performance, a reasonable fact-finder is entitled to conclude that such mitigation efforts were not determinative and that the overall success of the venture is due to the quality of a major component's contribution. Therefore, although EmigrantDirect's commercial success cannot establish conclusively the commercial reasonableness of Metavante's performance, the court certainly was entitled to consider it and to give this factor great weight.[12]

A fair reading of the district court's findings and oral ruling establishes, moreover, that the court considered

---

[12] We therefore cannot accept Emigrant's argument that, because, during contract negotiations, Metavante had refused to warrant EmigrantDirect's overall success, that overall performance is totally irrelevant to the court's determination of commercial reasonableness of Metavante's performance.

EmigrantDirect's commercial success as just one factor, albeit a significant one, in its determination that Metavante's performance had been commercially reasonable. The court, although emphasizing EmigrantDirect's success, also discussed the cooperative nature of the Emigrant-Metavante relationship. It noted testimony that the sides "work[ed] together continuously to address issues." R.545 at 9. The court also recognized "what [Emigrant CEO] Mr. Milstein was telling his board of directors during this enterprise with Metavante." *Id.* at 18. The court noted that Mr. Milstein was asked about "'some technological issues'" with EmigrantDirect and that "'he responded that most of these issues had been worked out with Metavante.'" R.538 at 20. The court also noted that, in October 2005, Emigrant inquired about doing more business with Metavante. *Id.* at 21. These facts suggest that Emigrant itself believed Metavante's performance to be reasonable. The district court also noted that the contract referred to a 25% "abandonment rate" in calculating a reasonable price. R.545 at 13-14. The district court simply did not regard EmigrantDirect's success as conclusive proof that Metavante performed reasonably.

We must conclude that the district court was under no legal misapprehension and committed no methodological misstep in its consideration of this issue.

## b.

Emigrant next contends that the district court's conclusion, that Metavante performed in a commercially

reasonable manner and therefore did not breach the performance warranty, was clearly erroneous. *See Int'l Prod. Specialists, Inc. v. Schwing America, Inc.*, 580 F.3d 587, 594-95 (7th Cir. 2009) (determination of material breach reviewed for clear error). In evaluating this contention, "[w]e do not reweigh the evidence or determine the credibility of witnesses." *Murdock & Sons Constr., Inc. v. Goheen Gen. Constr., Inc.*, 461 F.3d 837, 840 (7th Cir. 2006).

The district court emphasized, in addition to Emigrant's commercial success, the testimony of William Scialabba and John McNally about the working relationship between the parties, as well as Mr. Milstein's statements to the Emigrant Board of Directors. The district court concluded that this evidence evinced no material breach on the part of Metavante. The court's findings emphasized Metavante's good-faith diligence "to address any issues that arose." R.538 at 19. The findings also noted that Emigrant even had inquired about doing additional business with Metavante. *Id.* at 21. Further, the district court found that Emigrant had planned to terminate the Agreement for convenience well before the termination letter was sent. R.545 at 21. On the district court's view of the evidence, therefore, Emigrant had a product that was an outstanding commercial success, gave every indication that Metavante's performance was satisfactory, and enjoyed a good working relationship with Metavante—but nevertheless had planned to terminate the relationship, well before it actually attempted to do so. To the district court, these facts showed that Metavante's performance was commercially reasonable.

These findings are not clearly erroneous. They are supported by testimony from David Moffat, who suggested that, in the business world, technology is built with the business goal in mind. Emigrant used Metavante's technology to achieve its goal, as evidenced by the product's success. The findings were also supported by testimony that Metavante worked to fix problems as they arose. Mr. Milstein's remarks to the Board and Mr. McNally's interest in further business are evidence that Emigrant itself believed that Metavante was complying with its obligations. The record also provides evidence that Emigrant had long intended to terminate the Agreement. On September 27, 2005, the same day Milstein told the Board of Directors that most technological issues have been worked out with Metavante, he also told the Board that preparations were underway "to arrange for EmigrantDirect accounts to be managed within the Bank next year." *See* PX 104 at EMI-0076814. In November 2005, well before the May 2006 termination letter, Emigrant inquired about developing "a plan to enable the orderly transition of Metavante's services to Emigrant" and noted that "time is of the essence." Ex. 1338.

The Agreement reveals that the parties understood that they were dealing with the application of a relatively new technology. Problems along the way were a possibility, but the parties were committed to quickly fixing these problems. The parties did not expect "reasonable" to mean "perfect" or "flawless." Section 8.2 of the Agreement specifies that, before a party may terminate, either party shall have 30 days to either cure a default or

implement and "diligently carry-out" a plan to cure the default. That section also provides that

> any error in processing data, preparation or filing of a report, form, or file, *or the failure to perform Services as required hereunder* shall be satisfactorily cured upon the completion of accurate re-processing, the preparation or filing of the accurate report, form, or file, or the re-performance of the Services in accordance with applicable requirements, respectively.

Agreement § 8.2 (emphasis added). This contractual provision supports the district court's view that the parties expected that performance issues may arise, but that they were committed to fixing them. Under its terms, diligent efforts to correct problems is a key factor to commercially reasonable performance. Evidence of the parties' working relationship, Emigrant's ultimate success, and Emigrant's inquiry about additional business serve to support the district court's conclusion in this case.

Emigrant invites our attention to the testimony of its expert, Roger Nebel, and on Metavante's internal documents. However, this evidence does not *compel* a contrary inference.

## 2.

Emigrant's second contractual claim is that the district court erroneously held that the implied covenant of good faith and fair dealing was not breached in this case.

Emigrant emphasizes Metavante's internal documents and communications with Teknowledge, which are harshly critical of Teknowledge's performance. Emigrant contends that Metavante's failure to share these views with Emigrant breached the implied covenant.

Emigrant is correct that the implied duty of good faith and fair dealing is a part of the Agreement, just as it is a part of every other contract governed by Wisconsin law. *See Kreckel v. Walbridge Aldinger Co.*, 721 N.W.2d 508, 514 (Wis. Ct. App. 2006). Although "good faith" is a difficult term to define, Wisconsin courts have attempted to define "bad faith":

> "A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."

*Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 213 (Wis. Ct. App. 1995) (quoting Restatement (Second) of Contracts § 205 cmt. d). It is, of course, possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract. *Id.* at 212.

The district court held that "Metavante did not have an 'implied' duty to notify Emigrant when a computer application used to provide Services under the Agreement experienced a problem or issue." R.538 at 54. The court also held explicitly that "Metavante did not breach any implied covenant of good faith." *Id.* Emigrant offers

no reason to doubt these conclusions. The obligations of the parties to perform the terms of a contract must be evaluated in the context of the totality of the business arrangement contemplated by the contract. As we have noted earlier, the district court viewed the business arrangement here as a cooperative effort to develop a technological innovation in the financial services industry. The arrangement contemplated the possibility of glitches along the way that would require a cooperative effort to address and to rectify. Overall availability was measured by service level benchmarks. The district court determined that Metavante diligently moved to address the imperfections that arose. That determination is supported by the record.

## D.

We now shall turn to Emigrant's fraud claims. In Wisconsin, the elements of a cause of action for fraud in the inducement and for intentional misrepresentation are: (1) the defendant made a factual representation; (2) the factual representation was false; (3) the defendant made the factual representation knowing that it was untrue or without caring whether it was true or false; (4) the defendant made the representation with intent to defraud or to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied upon that statement to its detriment. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 211 (Wis. 2005).

**1.**

**a.**

We first address Emigrant's claim of fraudulent inducement. Wisconsin has adopted the rule found in Restatement (Second) of Contracts § 166, which provides:

> If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,
>
> (a) if the recipient was justified in relying on the misrepresentation . . . .

*See Hennig v. Ahearn*, 601 N.W.2d 14, 26 (Wis. Ct. App. 1999). Section 172 of the same Restatement is also pertinent:

> A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

*See Hennig*, 601 N.W.2d at 27.

Emigrant contended at trial that Metavante had made certain misrepresentations prior to the formation of the Agreement—namely, that Metavante's system was a "proven model" that was "truly integrated" and "fully scalable to large volumes." According to Emigrant, the

"proven model" claim was false because, at the time Metavante first had contact with Emigrant, Metavante had not yet made the decision to offer a direct bank and therefore had no product—certainly not a "proven model." R.578 at 139; Ex. 1081. Metavante, Emigrant claimed, did not have customers; it had one customer. The "truly integrated" representation was false, urges Emigrant, because Metavante employed a subcontractor, Teknowledge. R.578 at 143. The "fully scalable" representation was false because Metavante could not handle, as it claimed, 90 million accounts per day. R.578 at 158-59.

Emigrant now contends that the district court erred by holding that Emigrant could not rely justifiably on Metavante's alleged misrepresentations because it did not investigate them. The district court stated that "in the final analysis this is very much [a] two-way street; and as a consequence of the contract language such as it is, and such as that language was reviewed by individuals within Emigrant, they had as much an obligation to inquire as to whether de facto there would or were going to be used any subcontractors in fulfilling Metavante's contract obligations." R.545 at 10-11. Although the court here focused specifically only on the issue of subcontractors, it later made the more general point that Emigrant "has only itself to look to in terms of these asserted deficiencies that have been catapulted, if you will, into a suggestion that there was fraud." R.545 at 13.

When these statements are assessed in the context of the findings of fact and conclusions of law, we believe that it is very clear that the district court's point was

that, in light of the extensive pre-contract negotiations that took place in this matter, it was not reasonable for Emigrant to rely on any early sales pitch of Metavante; instead, Emigrant only could rely on the carefully negotiated terms of the final contract. Wisconsin law requires that a fraud plaintiff prove that his reliance is reasonable. *Kailin v. Armstrong*, 643 N.W.2d 132, 145-46 (Wis. Ct. App. 2002). All the facts and circumstances, "including the intelligence and experience of the misled individual and the relationship between the parties," must be considered in determining whether this condition was met. *Bank of Sun Prairie v. Esser*, 456 N.W.2d 585, 589 (Wis. 1990). When determining whether reliance is reasonable, the court essentially determines whether the plaintiff had the right to rely on the representations. *See Hennig*, 601 N.W.2d at 25 n.3. Whether reliance was reasonable is ordinarily a question of fact.[13] *Sciano v. Hengle*, 83 N.W.2d 689, 692 (Wis. 1957); *see also Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (applying Illinois law); *McWaters v. Parker*, 995 F.2d 1366, 1374 (7th Cir. 1993) (applying Indiana law). Here, two sophisticated businesses negotiated an arms-length transaction over a period of several months. R.522 ¶ 6, 25.

---

[13] In this case, the district court made conclusions of law suggesting that it was considering the issue as a matter of law. R.538 at 57. We believe it evident that if the court believed that Emigrant's reliance was unreasonable as a matter of law, it also believed that Emigrant's reliance was unreasonable as a matter of fact. We will evaluate the issue under the latter standard.

Both sides carefully reviewed the Agreement. *Id.* ¶ 7. Emigrant was represented by both in-house and outside counsel, *id.* ¶ 27, and engaged the services of a firm called Core-Teck to conduct a "Risk Review and Analysis of Metavante Contract," *id.* ¶ 38. Emigrant submitted several comments and suggested changes to the Agreement. *Id.* ¶ 32. The Agreement provided that subcontractors may be used. Agreement § 3.1. Moreover, the Agreement contained specific availability guarantees—namely, service levels of 98%—and a broad performance warranty. R.522 ¶ 12, 14.

There is no provision in the contract that recites explicitly that "Metavante's services are unproven, not scalable and not integrated." However, the Agreement, combined with the circumstances of its negotiation, permitted the district court to conclude that any reliance on oral representations in this case was unreasonable. Wisconsin case law makes clear that

> "[c]ourts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him."

*Ritchie v. Clappier*, 326 N.W.2d 131, 134 (Wis. Ct. App. 1982) (quoting *Jacobsen v. Whitely*, 120 N.W. 285, 286 (Wis. 1909)). Here, the negotiation process made clear to Emigrant the capabilities of Metavante and the expectations of the parties were memorialized in a written instrument with

an integration clause. Indeed, as a result of the negotiations, the parties drew up performance standards to serve as more precise benchmarks for Metavante's performance. Metavante's services were required to be available 98% of the time, and with respect to aspects of Metavante's performance other than availability, the parties agreed that Metavante was required to perform in a "commercially reasonable manner." Agreement § 6.1. These performance benchmarks addressed the same concerns as the alleged misrepresentations. Emigrant thus ensured that it would receive a desired level of service by negotiating for certain performance guarantees. Moreover, Emigrant was in a strong bargaining position. It did not agree to a mere form warranty that it had no power to change. It was able to request any additional assurances that it felt were needed.

Accordingly, we must conclude that the district court did not err in concluding that any reliance by Emigrant on the alleged misrepresentations of Metavante was not reasonable. The contract contained ample provisions that addressed the same concerns as Metavante's earlier alleged statements. We already have held that these provisions were not breached.[14]

---

[14] The cases relied upon by Emigrant do not support its position. In *Hennig v. Ahearn*, 601 N.W.2d 14 (Wis. Ct. App. 1999), there was an unacknowledged change in the final draft of the contract; most changes were highlighted and discussed by the parties as they passed drafts back and forth. The alleged misrepresentation was the failure to disclose this change; the

(continued...)

---

[14] (...continued)

court held that it was a question for the fact-finder whether reliance was reasonable. *Id.* at 24. The court only held that a jury *could* conclude that reliance was reasonable, not that a jury *must* so conclude. *Id.* at 24-25. Emigrant also relies on *First National Bank & Trust Co. v. Notte*, 293 N.W.2d 530, 539 (Wis. 1980). That case supports our holding; it states that "[t]he recipient's fault in failing to discover the facts before entering the contract does not make his reliance unjustified *unless his fault amounts to a failure to . . . conform his conduct to reasonable standards of fair dealing*." *Id.* at 539 (emphasis supplied). We have held that, in view of all the facts and circumstances, the district court was permitted to find that Emigrant's reliance was not reasonable. Emigrant also relies upon *Lewis v. Paul Revere Life Insurance Co.*, 80 F. Supp. 2d 978, 999 (E.D. Wis. 2000). In that case, an insurance applicant allegedly failed to disclose certain matters on his application. The applicant contended that the insurer's reliance on the application was not justified because he had authorized the insurer to obtain his medical records, which would have disclosed the matters at issue. The court disagreed, noting that "[n]othing on the face of Lewis's application made obvious that there was any falsity to its claims that Lewis never had known indications of or been treated for mental or emotional disorder and that he had not received medical treatment or advice during the past five years." *Id.* at 999. By contrast, in the present case, the district court determined that Emigrant's participation in contractual negotiations addressed the issues of the alleged early false representation and that Emigrant bargained for, and received, provisions in the arms-length contract that took any earlier representations into account. Finally, Emigrant

(continued...)

**b.**

We also note that, irrespective of the reliance issue, this fraud claim fails on other grounds. The district court determined that Metavante's claims that its product was "integrated" and "scalable" were not false. Indeed, the court adopted a finding stating that "Emigrant has failed to meet its burden of proving that the statements allegedly made by Metavante were both false and material." R.538 at 56. In its view, this case did not rise "to the level of even meriting serious consideration as a fraud claim" and that the fraud claim was "driven by the hard reality of one trying to avoid its contractual obligations that otherwise come into play and the Court has found applicable here." R.545 at 29. "[T]his is in the final analysis a breach of contract case . . . ." *Id.* at 3. Additionally, as we have discussed earlier, the concepts of "integration" and "scaleability" were inextricably bound up with the issue of whether Metavante's performance was commercially reasonable. Emigrant con-

---

[14] (...continued)

derives no assistance from *Household Finance Corp. v. Christian*, 98 N.W.2d 390 (Wis. 1959). That case holds that a bank was entitled to rely on the statements made on a loan application. It is true that the law does not require all recipients to examine critically, as a matter of course, representations made to them. *Id.* at 392-93. But the negotiation of a contract for services, which included performance benchmarks, by two sophisticated entities over a period of several months is a circumstance that is relevant to our analysis, and *Household Finance* is not to the contrary.

tended vigorously that Metavante's performance was commercially unreasonable because it was not scalable or well integrated. Therefore, when the district court made a determination on the question of commercial reasonableness, it was considering scaleability and integration.

The district court did not clearly err in this respect. Emigrant's own expert witness, Roger Nebel, testified that "integration" referred to putting together multiple parts in a way that works. R.571 at 210-11. "Scalable,"[15] according to the same witness, is "simply meant to indicate that the solution can grow in one or more of these dimensions," including new products, new volume or faster speed. R.572 at 5-6. As we have discussed earlier, there was ample evidence that Emigrant was satisfied with Metavante's performance and that Metavante's performance enabled Emigrant to achieve great success. To the extent Emigrant contends that Metavante represented that it would not use subcontractors, we note that section 3.1 of the Agreement, entitled "Performance by Subcontractors," allows for the use of subcontractors. This provision was obvious to Emigrant.

Metavante's alleged representations that its product was "proven," Appellant's Br. in 09-3007 at 34, present a slightly more difficult inquiry, because whether the product was "proven" is not directly related to the per-

[15] The trial transcripts use a different spelling - "scaleable." The parties use what we believe to be the more correct spelling. We shall follow the parties throughout this opinion.

formance of the product. However, at the time Metavante approached Emigrant, Metavante had a client—Capital One. Metavante referred Emigrant to Capital One, and Emigrant spoke to Capital One. This consultation opportunity allowed Emigrant to evaluate for itself whether Metavante was sufficiently "proven." Emigrant could speak with Capital One and request additional references if not satisfied.

> "[C]ourts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him."

*Ritchie*, 326 N.W.2d at 134 (quoting *Jacobsen*, 120 N.W. at 286).

**2.**

Emigrant also claims that Metavante intentionally misrepresented Teknowledge's adequacy throughout the Emigrant-Metavante relationship. The district court rejected this claim; Emigrant correctly points out that the court did so with little comment.[16] Emigrant relies

---

[16] The district court found that, "[b]oth before and during the Agreement, Emigrant had knowledge and was aware of the
(continued...)

on Moffat's admission that "what Metavante said to Teknowledge and what Metavante said internally about Teknowledge's performance [that it was inadequate] was indeed different from what they told EmigrantDirect." Reply Br. in 09-3007 at 11. Emigrant also points to an instance in 2005 when "Metavante assured Emigrant after numerous problems . . . that it had fully tested the capacity of its account opening system, while simultaneously warning that system's subcontractors that '[s]tress and performance testing has been inadequate: capacity planning appears nonexistent.'" Reply Br. in 09-3007 at 5. Specifically, Metavante told Emigrant that its system could handle 2,000 account openings per day, but told Teknowledge that the system was "inadequate to support solutions of the current scale." Ex. 1229 at MVNT-331122. Emigrant also appears to contend, if implicitly, that Metavante committed fraud when it failed to disclose Teknowledge's troubles.

We address only the claim that Metavante affirmatively made false statements about Teknowledge's capacities and abilities, telling Emigrant that Teknowledge's performance was adequate when it was, in reality, inade-

---

[16] (...continued)

facts and circumstances that form the basis of its claims for fraud in the inducement and intentional misrepresentation, and thus cannot prove those claims, let alone by clear and convincing evidence." R.538 at 56.

quate.[17] The district court's resolution of the contract claim and its remarks on the case's failure to "merit[] serious consideration as a fraud claim," R.545 at 29, make it clear that the district court found that Emigrant failed to prove that Metavante's representations that Teknowledge was adequate were false. We see no clear error in this determination for the reasons we stated in connection with the contract claim.

The district court committed no reversible error in determining that Emigrant's fraud claims were without merit.

## III

### FEES

We now turn to the fee petition filed by Metavante. First, we shall provide an overview of the facts of the fee proceedings. Next, we shall discuss whether Emigrant is entitled to fees on the "in-house claim." Finally, we shall turn to whether the district court properly allowed Metavante to submit redacted bills in support of its fee petition.

---

[17] Metavante had no duty to disclose defects in its system to Emigrant. This is so because, as we have stated, these defects did not amount to a breach of warranty, and Metavante attempted to fix these defects in good faith. *See supra* at II.C.2 (discussing implied covenant of good faith and fair dealing).

**A**.

Following the verdict, Emigrant moved to amend the judgment. Mindful that section 17.8 of the Agreement provided for the award of attorney's fees to the "prevailing party," Emigrant asked for amended findings that showed Emigrant to be the prevailing party on the "in-house claim." Emigrant stated that it was entitled to attorneys' fees relating to that aspect of the litigation and that Metavante was not entitled to its corresponding fees. R.553 at 3. The district court denied the motion. It held that there was no independent "in-house claim"; the "claim" that Emigrant so characterized was merely a partial defense. The court also stated that, "while [it] found that Metavante was entitled to an amount less than the full termination fee under the Agreement, the record is sufficiently clear on this point." R.556 at 3.

Subsequently, Metavante filed a petition for nearly $10 million in fees and costs. In support of the petition, it submitted redacted bills. The bills showed the amounts of time, rates, and money spent, but descriptions of work performed were redacted. Emigrant objected, arguing that redacted bills made reasonableness review impossible.

The court granted the fee petition in full. It held that under *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 200 F.3d 518 (7th Cir. 1999), the aggregate fee amount requested by Metavante was reasonable. It considered the factors mentioned in *Medcom* in reaching this conclusion, noting, among other things, that Metavante had paid its fees when the outcome of the case was uncertain and that the fees were not out of

proportion to the stakes of the case. Because line-by-line analysis was foreclosed by *Medcom*, unredacted bills were not required.

**B**.

We now turn to Emigrant's argument for fees related to the "in-house claim."[18] The Agreement provided that, if Emigrant terminated for convenience rather than for cause, it would have to pay a termination fee. If Emigrant migrated to an "in-house solution," the contract provided for a lower termination fee. Agreement, Termination Fee Schedule § 1(b). Emigrant points out that Metavante sought a termination fee of approximately $20.7 million. The district court, however, awarded a much lower termination fee of approximately $3.8 million. Therefore, Emigrant contends that it was the "prevailing party" on what it calls the "in-house claim," entitling it to a portion of its legal fees.

Emigrant relies primarily on the fee-shifting provision of the Agreement. That provision states as follows:

> If any legal action is commenced in connection with the enforcement of this Agreement or any instrument or agreement required under this Agreement, the prevailing party shall be entitled

---

[18] Metavante contends that Emigrant waived this argument by not submitting a fee petition of its own. However, Emigrant brought the argument to the court's attention in opposition to Metavante's petition.

to costs . . . incurred in connection with such action, as determined by the court.

Agreement § 17.8. We review the meaning of the contract term, "prevailing party," de novo. *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 788 (7th Cir. 2007). Here, the Agreement is unambiguous. The term "prevailing party" is a term of common usage in this context. It does not include, whether viewed in the abstract or in the context of this agreement, a party who has partial success on an affirmative defense. There was no separate and distinct "in-house claim" in the case; there was an in-house *issue*. Resolution of that issue caused Metavante to be awarded less damages than it had sought. We cannot accept Emigrant's argument that it is entitled to fees and costs attributable to litigation of this issue. The district court determined correctly that Emigrant's success on the in-house issue does not render it a "prevailing party" within the meaning of the contract. Emigrant left this litigation with nothing; in no sense is it the "prevailing party."

Emigrant also appears to contend that Metavante pursued the in-house issue in bad faith. It is well-settled that "a prevailing defendant may obtain attorneys' fees if the plaintiff litigated in bad faith." *Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009). The district court found nothing to indicate that Metavante pursued the issue in bad faith, and we see no basis for the reversal of that determination. Metavante argued at trial that the Agreement required that Emigrant's successor system be developed fully in-house, without any outside

assistance. The district court rejected this argument as a matter of contract interpretation. However, Emigrant advances no contention that this argument was frivolous.[19]

Metavante also argued that Emigrant had made use of Metavante's confidential information. As the district court noted, there was evidence showing that Emigrant was *in a position* to use confidential information. McNally testified that his job was to "explain[] away the functionality that we had in the Metavante system and try[] to make sure that we convert over everything that we

---

[19] Metavante submitted in its closing argument that,

> [f]or Emigrant's successor system to be in-house, Emigrant and Emigrant alone under Section 1B had to create its own data processing platform for that system; not hire someone else to create it, not hire someone else to assist in creating it or to assist in creating some portion of it.

R.578 at 33. Section 1(b) of the Termination Fee Schedule provided:

> Notwithstanding the foregoing, if after the initial thirty-six (36) months of the term, Customer migrates its data processing for direct banking to *an in-house solution by creating their own data processing platform*, Customer may terminate this Agreement without payment of any Termination Fee . . . . This special termination option shall not apply in the event Customer acquires software from another source to replace the Metavante services described in this Agreement and enables it to run in-house.

Agreement, Termination Fee Schedule § 1(b) (emphasis added).

needed to do into the in-house model." R.570 at 154. He also testified that he did a lot of reading and asked many questions in order to understand the "func-tionalities" of the Metavante system. *Id.* at 161-62. Notably, one of Emigrant's own experts, Dr. Stephen Garland of MIT, testified about the safeguards that are sometimes taken to avoid infringing on trade secrets and to avoid being sued for infringement. McNally testified, however, that no one was screened off of the in-house project and no one was directed not to use confidential information. R.570 at 235-36. This evidence provided a good-faith basis to pursue the in-house issue; the fact that Metavante ultimately was unable to prove, to the satisfaction of the district court, that Emigrant actually had used con-fidential information does not render it now liable for Emigrant's attorney's fees.

## C.

Emigrant submits that *Medcom* did not permit the use of redacted bills; rather, unredacted bills were required in order to allow the district court to review the fee request for reasonableness.[20]

---

[20] Metavante submits that Emigrant "never argued the *Medcom* line of cases supposedly requires the judicial examination of detailed attorney work entries that were indisputably sub-mitted to, reviewed, and paid by the client in the ordinary course of business." Appellee's Br. in 09-3996 at 21. However, we believe that Emigrant's argument was fairly presented to

(continued...)

In *Medcom*, we confronted a request for attorneys' fees on the basis of an indemnity clause. We made clear that indemnity clauses contain an implied requirement that

---

[20] (...continued)

the district court. Emigrant contended below that "a court should not dispense with an inquiry into the reasonableness of a fee request merely because the litigant paid its legal bills—the litigant must still justify the reasonableness of its requested fees and costs. This is so because, in reality, a party might choose to pay fees that are not commercially reasonable." Reply Br. in 09-3996 at FRA-12-13. Emigrant submitted that except for the fact that Metavante already had paid, "Metavante offers no other evidence by which Emigrant or the Court can meaningfully assess the reasonableness of Metavante's fees." *Id.* at FRA-14. Emigrant also specifically contended that "any showing of the reasonableness of Metavante's fees is impossible without detailed time records." *Id.* at FRA-16. These arguments are exactly the arguments that Emigrant now makes. Metavante is correct that Emigrant cited some inapposite cases and did not cite or address *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 200 F.3d 518 (7th Cir. 1999), but this fact does not work a waiver. A litigant may cite new authority on appeal. *See United States v. Rapone*, 131 F.3d 188, 196 (D.C. Cir. 1997) ("In the present case, Rapone is not attempting to raise the issue of a jury trial for the first time on appeal. Rather, he simply offers new legal authority for the position that he repeatedly advanced before the district court—that he was entitled to have his case tried before a jury."); Fed. R. App. P. 28(j) (allowing counsel to bring "pertinent and significant" new authority to the attention of the court after brief has been filed). None of Metavante's cited cases establish that a failure to cite *cases* works a waiver.

the fees sought be reasonable. *Medcom,* 200 F.3d at 520-21. The purpose of this requirement is "to guard against moral hazard—the tendency to take additional risks (or run up extra costs) if someone else pays the tab." *Id.* at 521. We stated:

> If attorneys submit bills that meet market standards of detail, their omission of information to which courts resort in the absence of agreement is of no moment. If the bills were paid, this strongly implies that they meet market standards. The fees in dispute here are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself. These are bills that MHC *actually paid* in the ordinary course of its business. The indemnity requires Baxter to make MHC whole, which means reimbursement for commercially-reasonable fees no matter how the bills are stated.

*Id.* at 520 (internal citations omitted; emphasis in original). We also said:

> Instead of doing a detailed, hour-by-hour review after the fashion of a fee-shifting statute, therefore, the district judge should have undertaken an overview of MHC's aggregate costs to ensure that they were reasonable in relation to the stakes of the case and Baxter's litigation strategy (plus the fact that this case was tried three times and appealed twice before). One indicator of reasonableness is that MHC paid all of these bills at a time when its ultimate recovery was uncertain.

> Another is that MHC's total legal fees and ex-
> penses came to about $200,000 less than Baxter's.

*Id.* at 521.

We further developed the *Medcom* principles in *Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069 (7th Cir. 2004). In that case, the appellant had submitted an affidavit, which we called "excruciatingly detailed," from a firm that reviews lawyers' bills; the affidavit stated that Taco Bell had overpaid its lawyers. *Id.* at 1075-76. We did not discuss the contents of the affidavit; we simply stated that, "[b]ecause of the resulting uncertainty about reimbursement, Taco Bell had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review." *Id.*[21]

---

[21] *Medcom* involved a contract that was governed by the law of Illinois. 200 F.3d at 519. However, our decision was not based on Illinois law. Indeed, even when fees are sought pursuant to a contract, Illinois courts require more exacting scrutiny: "[T]he petition for fees must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." *Kaiser v. MEPC Am. Props., Inc.*, 518 N.E.2d 424, 427-28 (Ill. App. Ct. 1987). Because of the importance of these factors, it is incumbent upon the petitioner to present detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated. *Id.*

(continued...)

Emigrant submits that the district court misapplied *Medcom* when it permitted Metavante to submit redacted bills. Emigrant focuses on our comments about "market standards of detail," *Medcom*, 200 F.3d at 520, to argue that, while "contracting parties have no basis to complain" "if summary bills without detailed time records are acceptable to and paid by clients," such bills were not accepted by Metavante in this case, Appellant's Br. in 09-3996 at 18.

*Medcom* and its progeny hold that, as a matter of the efficient and fair administration of the federal courts, individual scrutiny of line-item entries is neither necessary nor appropriate in contractual fee-shifting cases. Given the fact that the fees were paid by a party who had no reassurance of indemnity, we believed that market considerations normally would render unnecessary resort to the time-consuming examination of individual expenses. For the federal courts, such exercises drain the

---

[21] (...continued)

In *Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069 (7th Cir. 2004), we made explicit that *Medcom* was grounded in federal law and explained the reason. The issues involved were requirements of proof, which "concern how a particular court system, having regard for its resource constraints and the competing claims on its time, balances the cost of meticulous procedural exactitude against the benefits in reducing error costs." *Id.* at 1076. We cited cases holding that "[t]he decision to hold an evidentiary hearing when making an attorney's fee award is a matter of procedure." *Id.* (internal quotation marks omitted).

institution of its most valuable resource—time. As an alternative methodology, we stated:

> Instead of doing a detailed, hour-by-hour review after the fashion of a fee-shifting statute, therefore, the district judge should have undertaken an overview of MHC's aggregate costs to ensure that they were reasonable in relation to the stakes of the case and Baxter's litigation strategy (plus the fact that this case was tried three times and appealed twice before).

*Medcom*, 200 F.3d at 521. In *Taco Bell*, we reiterated this operating principle when the non-prevailing party submitted a detailed affidavit scrutinizing the prevailing party's fees. We did not examine this affidavit, stating that "where there are market incentives to economize, there is no occasion for a painstaking judicial review." *Taco Bell*, 388 F.3d at 1076.

Emigrant submits that allowing the submission of redacted bills effectively amounts to a prepayment standard—if the prevailing party has paid its legal bills, the opposing party must pay those costs. This result, in Emigrant's view, would vitiate the reasonableness requirement. In *Medcom*, however, we took the view that, in the normal course of adjudication, "reasonableness must be assessed using the market's mechanisms," 200 F.3d at 520, and that aggregate costs should be reviewed for reasonableness *in relation to* certain other factors, *id.* at

521.[22] Of course, special circumstances may arise in which a district court will have reason to doubt whether market considerations alone were sufficient to ensure reasonable fees. In those instances, the district court, as a matter of its sound discretion, can require additional information of the parties. In such instances, of course, the court must proceed with due regard for the attorney-client privilege and for the protection of other confidential and proprietary information. Here, we are convinced that none of the concerns articulated by Emigrant were of such moment as to make it an abuse of discretion for the district court to decline to depart from the approach established in *Medcom*.

Here, the district court made the determination of reasonableness on the basis of not only the presumptive validity of market forces, but also the affidavits of the parties which assured the court that rates had been negotiated, supporting documentation had been re-

---

[22] In *Medcom*, we referred to "bills that meet market standards of detail." 200 F.3d at 520. Our focus, however, was on the perspective of the prevailing party who received, reviewed and paid the bills. *See id.* ("If the bills were paid, this strongly implies that they meet market standards."). *Medcom* was referring to bills that met market standards of detail *in the form that the general counsel reviewed*. *Medcom* recognizes that the prevailing party's general counsel, or similar corporate officer, has a duty, imposed by various provisions of federal and state law, to scrutinize the bills before paying them; this is why it places great weight on the fact that the prevailing party paid the bills without assurance of repayment.

viewed and pertinent questions asked. The court also was faced with a situation in which the party challenging the fees as excessive had declined to reveal its own fees as a measure of a reasonable expenditure. Indeed, while criticizing Metavante for retaining an out-of-town firm to handle the trial, Emigrant itself proceeded with a comparable out-of-town firm of its own. Emigrant also makes much out of the fact that some legal costs were incurred by Metavante after it was aware of its status as the prevailing party. Given the district court's awareness of how Metavante's general counsel and its outside counsel had negotiated the fee arrangement, we believe that the court acted within the bounds of its discretion in determining that no additional guarantee of reasonableness was required.

General counsels, as corporate officers and as members of the bar, have a great responsibility to ensure that rates charged their client reflect the exercise of the highest standards of fiduciary duty; similarly, representations made to the court about fee arrangements must reflect exacting levels of candor. The judges of the district court have the responsibility—and the authority—to ensure that these standards are met. We only hold that in most situations, as here, this responsibility can be discharged without line-by-line scrutiny of submissions.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED